UNITED STATES of America, Plaintiff-Appellant,

v.

Dennis Roy CHOATE, Defendant-Appellee.

No. 76–3486.

United States Court of Appeals, Ninth Circuit.

March 15, 1978.

Rehearing and Rehearing En Banc Denied June 6, 1978.

Carleton D. Powell (argued), Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Richard G. Sherman (argued), Los Angeles, Cal., for defendant-appellee.

Timothy B. Flynn, Fred Okrand, Los Angeles, Cal., for amici curiae.

Before CUMMINGS *, HUFSTEDLER and WALLACE, Circuit Judges.

CUMMINGS, Circuit Judge.

On August 21, 1974, a two-count indictment was returned against defendant, then a resident of Long Beach, California. Count One charged that defendant filed a false individual income tax return for 1970, listing his adjusted gross income as $4,681 instead of the correct figure of $32,581, in violation of 26 U.S.C. § 7201. Count Two charged a similar violation for the year 1971, with defendant listing his adjusted gross income as $5,306 instead of the proper figure of $64,744.

Two and one-half months later, defendant filed a motion to dismiss the indictment on the ground that it was "the result of impermissably [sic] discriminatory law enforcement and unequal application of the law denying the defendant equal protection of the law." On December 6, 1974, this motion was granted and the case dismissed on the ground that the activities of government informer Tony Gordon had violated defendant's Sixth Amendment right to counsel. On appeal this Court held that the Government's attempted use of Gordon had not prejudiced defendant, so that the case was remanded for trial. *United States v. Choate,* 527 F.2d 748 (9th Cir. 1975).

Upon remand, defendant filed a motion on March 12, 1976, to suppress all the physical items of evidence sought to be introduced against him. After first hearing evidence on July 13, 1976, Judge Ferguson granted the motion to suppress "as to mail cover issue" after hearing oral argument on October 18, 1976. A memorandum opinion was filed on November 16, 1976, and is now reported in 422 F.Supp. 261. On the same date, the Government appealed the ruling granting the motion to suppress evidence, and on December 7, 1976, the Government filed an amended notice of appeal to include Judge Ferguson's memorandum decision. Jurisdiction properly was lodged in the district court under 26 U.S.C. § 7201 and 18 U.S.C. § 3332, and the appeal of the order granting the motion to dismiss was taken pursuant to 18 U.S.C. § 3731.

In the district court, defendant initially argued that a now-deceased state government informant named Carl Thompson had obtained substantial information from an illegal search of defendant's residence, supposedly providing the impetus for the entire income tax investigation that culminated in defendant's indictment and prosecution. However, Judge Ferguson held that the Government had established by a preponderance of the evidence that any such illegality "did not taint the evidence in this case in more than a de minimis manner" (422 F.Supp. at 263).

Concerning the "mail cover issue," the court found that the Government had initiated a mail cover on defendant's mail from July 31, 1972, to August 25, 1972.[1] This mail cover permitted the recording of the data appearing on the outside cover of defendant's incoming first and fourth class mail at three listed addresses, two in Balboa and one in Newport Beach, California. The data consisted of the class of mail, the name of the addressees (occasionally a piece of mail was addressed to Choate and another person), name and return addresses of the senders and place and date of postmarks on mail going to defendant.

The mail cover was obtained through Bureau of Customs Special Agent Melvin C.

---

* The Honorable Walter J. Cummings, United States Circuit Judge, Seventh Circuit, sitting by designation.

1. Under the postal regulations, a mail cover is defined as:

 "Mail cover" is the process by which a record is made of any data appearing on the outside cover of any class of mail matter, including checking the contents of any second-, third-, or fourth-class mail matter as now sanctioned by law, in order to obtain information in the interest of (i) protecting the national security, (ii) locating a fugitive, or (iii) obtaining evidence of commission or attempted commission of a crime. 39 C.F.R. § 233.2(c)(1) (1975).

 Under 39 C.F.R. § 233.2(c)(3), "crime" is defined as "any commission of an act or the attempted commission of an act that is punishable by law by imprisonment for a term exceeding 1 year."

Johnson's letter to the postal inspector in charge in Los Angeles, California. The letter read as follows:

July 19, 1972

LA06RO692701

Mr. Stanley H. Jenson
Postal Inspector in Charge
P.O. Box 30456
Los Angeles, California

Dear Sir:

A cover for First and Fourth Class mail is requested for the following names and addresses:

Dennis Roy CHOATE
511 W. Bay St., Apt. A
Balboa, California

CARSON AND CHOATE SURF-BOARDERS
2811 Newport Blvd.
Newport Beach, California

Dennis Roy CHOATE
P.O. Box 886
Balboa, California

The above listed subject is currently under investigation by this office for the suspected smuggling of large quantities of narcotics into the United States. CHOATE is currently organizing a large narcotic smuggling ring with the primary source located in South America. *It is felt* that CHOATE and the source in South America correspond by mail. Return addresses on mail received at the above addresses would be of aid in identifying the source in South America and other members of the smuggling ring. It is requested that a mail cover be placed at the above addresses for a period of 30 days. It is further requested that all replies be directed to Special Agent Lynn P. Williams.

Smuggling narcotics into the United States is in violation of Title 21 USC 952 and carries a penalty under Title 21 USC 960(a)(1) of 15 years imprisonment or a fine of $25,000 and/or both. CHOATE is not under indictment as a result of any investigation conducted by this office nor does this office have any knowledge of any other indictments pending against CHOATE. It is believed that CHOATE has retained Sherman & Sturman, Attorneys at Law, 8500 Wilshire Blvd., Suite 908, Beverly Hills, California as legal counsel.

Your cooperation in this matter would be appreciated.

Sincerely yours,
MELVIN C. JOHNSON
Special Agent in Charge

cc; SUI 5
[Lynn] WILLIAMS/ab
"422 F.Supp. at 264–265 n. 5". (emphasis supplied.)

This letter was initiated by Special Agent Lynn Williams of the Drug Enforcement Agency who was then working as a special agent for the Bureau of Customs, assigned to its hard narcotics unit. In March or April 1972, Williams had been assigned to investigate defendant because he was suspected of importing large quantities of cocaine into the United States.

Judge Ferguson first held that the foregoing letter did not specify "the reasonable grounds that exist" for requesting a mail cover as required by a July, 1965, postal regulation, which provides that all postal inspectors in charge may order mail covers within their district, *viz.:* [2]

"Where written request is received from any law enforcement agency of the Federal, State, or local governments, *wherein the requesting authority stipulates and specifies the reasonable grounds that exist* which demonstrate the mail cover would aid in the location of a fugitive, or that it would assist in obtaining information concerning the commission or attempted commission of a crime" (39 C.F.R. § 233.2(e)(1)(ii); emphasis supplied).

The district court next held that the use of the mail cover as part of the early narcotics investigation of defendant was un-

---

**2.** The mail cover regulations were republished without substantial change in March 1975. 40 Fed.Reg. 11579 (March 12, 1975).

constitutional under the Fourth Amendment, citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. The opinion noted that it was the identity of the sender that was of interest to the law enforcement authorities here and that a reasonable person who posted a piece of mail would have an expectation of privacy "(1) that the information contained in the return address will only be used for postal purposes, and (2) that it will be utilized in only a mechanical fashion without any records being kept" (422 F.Supp. at 270). Judge Ferguson could find no compelling governmental interest which could justify the incursion on what he viewed to be a substantial privacy interest.

In closing, the district court concluded that all the evidence the Government sought to introduce against the defendant "was derived from exploitation of leads derived from the illegal mail cover" (422 F.Supp. at 271), so that no part of the evidence could be purged of the taint of the mail cover. In its principal brief the Government admitted that it could not prove the absence of taint if the mail cover was illegal (Br. 8), and at the oral argument the Government conceded that it could not proceed with the trial if the motion to suppress evidence was properly granted. We reverse.

*The Government's Evidence Was Not Fatally Tainted by Informant's Entry into Defendant's Home.*

■ The district court found that Carl Thompson, an informer for Primo T. Orosco of the California Bureau of Narcotics Enforcement, had burglarized defendant's Huntington Beach, California. residence in April 1971 and had obtained Choate's future wife's Farmers and Merchants Bank statement for the period March 15-April 15, 1971. However, the court held that the Government established by a preponderance of the evidence that any such illegality "did not taint the evidence in this case in more than a de minimis manner" (422 F.Supp. at 263). In attacking this holding, it was unnecessary for defendant to file a cross-appeal because he was endeavoring to support the judgment in his favor on this issue on the claim that he had advanced below. *United States v. Campbell*, 293 F.2d 816, 822 (9th Cir. 1961).[3] We are in accord with the district court's disposition of this matter.

■ The record shows that Carl Thompson, who died in May 1976, was used as an undercover informer in April and May 1971 by California Narcotics Agent Orosco to help build a state narcotics case against defendant in exchange for favorable treatment in a potential inquiry into Thompson's own connections with narcotics importation. In Orosco's May 3, 1971, report for the California Bureau of Narcotics Enforcement, he noted that the bank statement Thompson had obtained from defendant's residence in April 1971 was for an account in the name of Suzanne Sylvester (later Mrs. Choate) and that Thompson had indicated that she and defendant were authorized to sign on her account at the Farmers and Merchants Bank in Long Beach, California.

Orosco's report was turned over to Special Agent Lynn Williams of the Federal Bureau of Customs in early April of 1972. In order to give Williams a feeling for the hard narcotic unit's work, the Bureau gave Williams some closed files to study. Believing that there was sufficient information in Choate's file to warrant fuller investigation, Williams had reopened an earlier federal narcotics investigation of defendant closed in April 1971. Orosco's report was in Choate's file. Williams had discussions with Thompson during the Spring of 1972 concerning his relationship to Dennis Choate and his involvement in deriving narcotics intelligence regarding Choate for state narcotic agencies. During his ensuing

---

**3.** See also *Tiedeman v. Chicago, Milwaukee, St. Paul & Pacific R. Co.*, 513 F.2d 1267, 1272-1273 (8th Cir. 1975); *Olympic Fastening Systems, Inc. v. Textron, Inc.*, 504 F.2d 609, 617-618 (6th Cir. 1974); *James v. Reese,* 546 F.2d 325 (9th Cir. 1976); 9 Moore's *Federal Practice* ¶ 204.-11[3].

narcotics investigation of defendant, Williams developed information regarding defendant's assets, in order to see if they coincided with the amount of cocaine reportedly involved, which was later communicated to the Internal Revenue Service and used as part of the present tax prosecution. On May 8, 1972, Williams determined that defendant was not a signatory on, and had no interest in, the Farmers and Merchants Bank account mentioned in Orosco's report and made no further use of that account in tracing defendant's assets. When Williams turned over his information relating to defendant's assets to the Internal Revenue Service, none of that information emanated from Suzanne Sylvester's bank account.

Special Agent Raymond Sherrard of the Internal Revenue Service commenced a criminal tax investigation of defendant in the late Spring of 1972 after being contacted by Customs Agent Williams. Williams told Sherrard that Choate was outspending his apparent means and turned over some of his information on Choate to the Internal Revenue Service since Williams had not been able to build a substantive narcotics case against Choate. Sherrard ceased his investigation in July 1972, when he was unofficially replaced by IRS Special Agent Emmett S. Roach.

In September 1972 Roach was officially placed in charge of the investigation involving defendant's violation of the income tax laws. Williams gave him Orosco's May 1971 report. Roach had the task of verifying expenditures made by defendant in 1970 and 1971, the two tax years included in this indictment. No reference was made to the Farmers and Merchants Bank account in verifying the expenditures for 1970 when Roach began his investigation. However, when he was examining defendant's expenditures for 1971, he discovered that out of defendant's $50,000 in expenditures for that year, under $500, precisely $432.59,[4] was made through that account, while over $44,000 was expended in cash without reference to any bank account. The $432.59 in

question was first documented by records from the credit card recipients and only later verified by the bank statement. Since these payments amounted to less than $500, Judge Ferguson was certainly justified in concluding that Thompson's obtaining of the merely corroborating one-month bank statement "did not taint the evidence in this case in more than a de minimis manner" (422 F.Supp. at 263).

Thompson's entry into defendant's Huntington Beach residence was to learn of defendant's narcotics activity, and defendant is now being charged with tax evasion. Defendant's modest expenditures to the credit card companies made through the Farmers and Merchants Bank in 1971 were ascertained through the three credit card companies before any recourse to the bank statement. The amount was extremely small in comparison with the understatements of income alleged in the indictment. Consequently, under the various standards developed in *United States v. Bacall,* 443 F.2d 1050 (9th Cir. 1971), the Thompson burglary, upon the preponderance of evidence in the record (*United States v. Cales,* 493 F.2d 1215, 1216 (9th Cir. 1974), did not fatally taint the Government's evidence and did not require its suppression. Because the standard of proof in the district court was preponderance of the evidence, we may not overturn the district judge in this regard unless his factual conclusion was clearly erroneous. As demonstrated above, it was not.

*There Was Compliance with the Postal Regulations.*

■ As already noted, 39 C.F.R. § 232.-2(i)(1)(ii) requires the requesting authority to stipulate and specify "the reasonable grounds that exist which demonstrate the mail cover would aid in * * * obtaining information concerning the commission or attempted commission of a crime." Here the requesting authority stated that the Bureau of Customs was investigating defendant for the suspected smuggling of

---

4. The $432.59 consisted of payments of $117.60 and $70.36 to Master Charge, $54.58 and $118.72 to Diner's Club and $71.33 to Carte Blanche.

large quantities of narcotics into the United States. He was said to be "currently organizing a large narcotics smuggling ring with the primary source located in South America." In his key letter, the special agent in charge of the Bureau of Customs office in Los Angeles then stated "It is felt that [defendant] CHOATE and the source in South America correspond by mail." Johnson next wrote that return addresses on mail received at defendant's listed three addresses "would be of aid in identifying the source in South America and other members of the smuggling ring." Johnson noted that smuggling narcotics into the United States violated 21 U.S.C. § 952, with a penalty of fifteen years' imprisonment or a fine of $25,000, or both, under 21 U.S.C. § 960(a)(1). He added that defendant was not under indictment as a result of any investigation conducted by Johnson's office, and that Johnson's office knew of no other indictments pending against defendant, whose lawyer was then identified so that in accordance with customary practice under 39 C.F.R. § 233.2(f)(2), there would be no mail cover of correspondence between Choate and his counsel.[5]

Judge Ferguson decided that the letter was defective because Johnson used the phrase "It is felt" that the defendant and the source in South America correspond by mail:

"The [regulation] should, therefore, be read as having some substantial significance—if an agency's mere 'feeling' that criminal activity is afoot is sufficient to provide the needed showing, it will have been read out of existence" (422 F.Supp. at 266).

In our judgment this was too strict an interpretation of the regulations. The let-ter written by one layman to another is replete with "reasonable grounds" demonstrating that the mail cover would aid the Bureau of Customs in obtaining information concerning the commission or attempted commission of a crime, as required by this regulation. Neither the regulations governing requests for mail covers nor the postal interpretation of mail cover procedures require a probable cause finding or a determination by a judicial officer.[6] According to House testimony of William J. Cotter, Chief Postal Inspector, United States Postal Service in 1975, which we must take as an authoritative construction of the regulations (*Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 13 L.Ed.2d 616), "mail covers were to be instituted only upon written request stipulating and specifying a reasonable need for the mail cover and a proper reason for its use." Postal Inspection Hearings at 47. The regulations simply do not require the specification of the factual predicate upon which the requesting agency basis its conclusion that the mail cover subject is involved in the commission or attempted commission of a crime. Failure to specify this predicate is proper under the regulations. Whether a mail cover may sustain constitutional muster will be addressed *infra*. "Mail covers cannot be authorized for exploratory purposes" where reasonable grounds are not put forth to show the cover will aid in the investigation of a crime. Postal Inspection Hearings at 52.

Of course, Stanley H. Jenson, the postal inspector in charge or his designee had to be satisfied under the regulations that the Bureau of Customs' request set forth reasonable grounds to demonstrate that the mail cover would assist in obtaining infor- ·

---

5. Since Thompson was represented by the same lawyer as defendant in 1971 or earlier, Thompson probably relayed the lawyer's name to Orosco. It also should be noted that the secretary for defendant's lawyer had previously been employed by Thompson. Thompson was convicted of conspiracy to import narcotics into this country in 1970. See *United States v. Thompson*, 493 F.2d 305 (9th Cir. 1974), certiorari denied, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60.

6. Hearings on Postal Inspection Service's Monitoring and Control of Mail Surveillance and Mail Cover Programs before the House Subcommittee on Postal Facilities, Mail and Labor Management of the House Committee on Post Office and Civil Service, 94th Cong., 1st Sess., Ser. No. 94–39, 49, 51–52 (1975) (hereinafter "Postal Inspection Hearings")

mation about the commission or attempted commission of a crime (39 C.F.R. §§ 233.-2(e)(1)(ii) and 233.2(e)(2)). Moreover, the Chief Postal Inspector must be convinced in his review of actions taken by postal inspectors upon initial submission of a report on a request for a mail cover that the regulations have been satisfied. 39 C.F.R. § 233.-2(i). The requesting letter stated that defendant was currently organizing a large narcotics smuggling ring with its primary source in South America and that it was suspected of smuggling large quantities of narcotics into the United States. Based on their prior experience, the requesting special agent and his associates would know that defendant and his South American source would probably correspond by mail. The Committee for Public Justice and the American Civil Liberties Union Foundation of Southern California (*amici*) filed a joint brief and participated in the oral argument urging affirmance of the district court's decision. One of their grounds is that there was noncompliance with the postal regulations because requesting Special Agent Jenson wrongfully stated in his July 19, 1972, letter to the Los Angeles postal inspector in charge that "CHOATE is *currently* organizing a large narcotics smuggling ring with the primary source located in South America" (emphasis supplied). *Amici* attack this statement on the ground that the federal narcotic investigation of defendant had been closed in April 1971. However, it was reopened by Special Agent Lynn Williams on April 3, 1972, because of additional information received by the Bureau of Customs. That narcotics investigation was continuing even at the time of the July and October 1976 hearings below. Therefore, *amici* cannot fault the mail cover request on the ground that it related to a closed matter. Although the requesting letter was apparently prepared by Agent Williams (422 F.Supp. at 264), defendant on appeal and the district judge did not question Williams' veracity, and it is inappropriate for us as reviewing judges to impugn his truthfulness on the basis of a cold record that can be read consistently with the contents of the letter.

Viewing the Jenson letter, drafted by a nonlawyer, in a "practical and not abstract * * * commonsense and realistic fashion," it satisfies the applicable regulations, as the Supreme Court held with respect to affidavits for search warrants in *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684. As Justice Goldberg there stated, "Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." (*Id.*) Since hypertechnical niceties should not be applied to this mail cover request,[7] we hold that there was no violation of the applicable postal regulations. Accordingly, there is no need to suppress the evidence on the ground of intentional circumvention of administrative regulations as in *United States v. Caceres*, 545 F.2d 1182 (9th Cir. 1977).

### The Mail Cover Does Not Violate the Constitution

"[T]he protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States." *Katz v. United States*, 389 U.S. 347, 350–351, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (footnotes omitted). Almost tautologically, only if specific "provisions of the Constitution protect personal privacy from other forms of governmental invasion" (*id.* at 350, 88 S.Ct. at 510) will a person be able to raise the shield of the Constitution against the practice. The specific sources for zones of privacy in the Constitution seem only to include the First, Third, Fourth, Fifth and Ninth Amendments. *Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510. If a zone of privacy cannot be grounded on neutral principles rooted in one of these constitutional sources, it simply may not enjoy constitutional protection. See Craven, *Personhood: The Right to Be Let Alone*, 1976 Duke L.J. 699, 704.

Requiring that a constitutional right be locatable in the Constitution most em-

---

7. See *Andresen v. Maryland*, 427 U.S. 463, 478–479 n.9, 96 S.Ct. 2737, 49 L.Ed.2d 627.

phatically does not, of course, suggest a strict circumscription of the various specific constitutional guarantees in the Bill of Rights. Each guarantee still has its *Griswold* penumbras and emanations. But if it is demonstrated *seriatim* that none of the specific guarantees creates a zone of privacy in a given case, then there simply is not a constitutional "right of privacy" in that case. Nor is there any question of synergistic coupling between the several Bill of Rights guarantees to create by the operation of all of them together a constitutional right not locatable upon any one of them. See *Whalen v. Roe*, 429 U.S. 589, 598–599 n. 23, 97 S.Ct. 869, 51 L.Ed.2d 64. This follows from the text of the Ninth Amendment itself: "The enumeration in the Constitution, of certain rights, shall not be *construed* to deny or disparage others retained by the people." *Griswold v. Connecticut*, 381 U.S. 479, 491–492, 85 S.Ct. 1678, 1686, 14 L.Ed.2d 510 (Goldberg, J., concurring).

So posed, our task is to analyze the several specific provisions in the Bill of Rights to see if the zones of privacy emanating therefrom encompass Choate's claimed right to have a mail cover placed on his mail. Clearly, under the facts of this case, the Third Amendment may be dismissed by an *ipse dixit*. Nor need the Fifth Amendment give us pause since defendants and the *amici* concede that mail cover information derives from an exterior inspection when the mail matter is still under the *sender's* control.[8] Indeed neither the Third nor the Fifth Amendments were raised anywhere in the record below. Only the Fourth and First Amendments have been relied upon.

*This Mail Cover Does Not Violate the Fourth Amendment*

We now turn in our analysis to inquire whether the Fourth Amendment was violated by the mail cover. As explained by the Seventh Circuit in *United States v. Balistrieri*, 403 F.2d 472, 475 n. 2 (1968), a mail cover is conducted by the Postal Service's furnishing the requesting government agency with the information appearing on the face of the envelope or packages addressed to a suspect. Information given includes the name of the addressee, the postmark, the name and address of the sender (if it appears), and the class of mail. The mail itself is promptly delivered to the addressee, and the Postal Service furnishes this confidential information only to the requesting agency. A crime has to be a felony before a mail cover will be permitted under 39 C.F.R. § 233.2(e)(1)(ii).[9] See note 1 *supra*.

First of all, there is some question whether this mail cover even constituted a "search" within the Fourth Amendment for, as this Court explained in *United States v. Solis*, 536 F.2d 880, 881 (9th Cir. 1976):

"Generally evidence acquired by unaided human senses from without a protected area is not considered an illegal invasion of privacy, but is usable under doctrines of plain view or open view or the equivalent."

Assuming a search was involved here, since 1878, it is settled that the Fourth Amendment's protection against "unreasonable searches and seizures" protects a citizen against the warrantless opening of sealed letters and packages addressed to him in order to examine the contents. *Ex parte Jackson*, 96 U.S. 727, 24 L.Ed. 877. A recent article by Professor Geoffrey R. Stone discussed the scope of the Fourth Amendment since that time, The Scope of the Fourth Amendment: Privacy and the Policy Use of Spies, Secret Agents and Informers, American Bar Foundation Research Journal 1195 (1976). As shown therein, the most important relevant case since *Ex parte Jackson* is *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. There the Supreme Court held that because of the Fourth Amend-

---

**8.** The only conceivable substantive Fifth Amendment protection would be over self-incrimination or fundamental liberty interests. See *Whalen v. Roe*, 429 U.S. 589, 598–599 n. 23, 97 S.Ct. 869, 51 L.Ed.2d 64. Choate does not have standing to raise either one.

**9.** Postal Inspection Hearings, 10, 47.

ment the prosecution could not introduce evidence of the contents of a telephone conversation of the defendant, which was heard by placing a device on the outside of the public telephone booth in which the defendant was speaking, since an individual speaking to someone over the telephone has a "reasonable expectation of privacy" with respect to the contents of those conversations. 389 U.S. at 360, 88 S.Ct. at 516. (Justice Harlan concurring). The Court decided that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection," whereas "what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U.S. at 351, 352, 88 S.Ct. at 511. "[T]he Fourth Amendment protects people, not places." *Id.* at 351, 88 S.Ct. at 511.

Prior to *Katz*, the courts uniformly upheld the constitutionality of mail covers. *E. g., United States v. Costello*, 255 F.2d 876, 881 (2d Cir. 1958); *Canaday v. United States*, 354 F.2d 849 (8th Cir. 1966); *Cohen v. United States*, 378 F.2d 751 (9th Cir. 1967), certiorari denied, 389 U.S. 897, · 88 S.Ct. 217, 19 L.Ed.2d 215; *Lustiger v. United States*, 386 F.2d 132 (9th Cir. 1967), certiorari denied, 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142.

Subsequent to *Katz*, the crucial question presented has been whether an individual has a reasonable expectation of privacy which would prevent the Government from inspecting information contained on the outside of mail addressed to him. In all post-*Katz* decisions except this, the courts have again sustained mail covers on the ground that there is no reasonable expectation that such information will remain unobserved. *United States v. Bianco*, 534 F.2d 501, 508 (2d Cir. 1976); *United States v. Leonard*, 524 F.2d 1076, 1087 (2d Cir. 1975); *United States v. Balistrieri, supra; United States v. Isaacs*, 347 F.Supp. 743, 750 (N.D.Ill.1972), affirmed on other grounds, 493 F.2d 1124 (7th Cir. 1974), certiorari denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146. Less than three months after *Katz*, certiorari was denied in our

*Lustiger* case, *supra.* However, it does appear that the instant case is the first post-*Katz* situation where the constitutionality of the mail cover device has been squarely presented in a manner requiring extended analysis.

While the Supreme Court has not expressly passed on the mail cover device, recent analogous opinions lead us to conclude that it would not hold mail covers unconstitutional even though neither the addressee nor the sender is aware that the exterior data is being used for purposes other than the proper routing of the mail. In *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71, it was held that a bank customer has no legitimate "expectation of privacy" in the contents of his original checks and deposit stubs because they "contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." 425 U.S. at 442, 96 S.Ct. at 1624. Here too the information in question was voluntarily conveyed to the Postal System and exposed to its employees and others in the ordinary course of passage of letters and packages from the senders to the defendant. The following passage from Justice Powell's *Miller* opinion, substituting the mailer for the depositor, seems singularly apt:

"The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. *United States v. White*, 401 U.S. 745, 751–752, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to government authorities, *even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. Id.* at 752, 91 S.Ct. 1122; *Hoffa v. United States*, 385 U.S. [293] at 302, 87 S.Ct. 408, 17 L.Ed.2d 374; *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963)." (Foot-

note omitted, emphasis supplied.) 425 U.S. at 443, 96 S.Ct. at 1624.

This portion of *Miller* concluded that even if the banks were acting solely as Government agents in transcribing the information and complying with the subpoenas, there would be no intrusion upon the depositors' Fourth Amendment rights. *Id.* Applying *Miller* here would mean the transcription of the information in question by the postal authorities and the transmitting of it only to the Bureau of Customs would not violate the Fourth Amendment.[10]

Subsequently, in *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300, the Court held that the warrantless arrest of Mrs. Santana upon the threshold of her dwelling-house would not violate the Fourth Amendment because she was not in an area where she had any expectation of privacy and because what she knowingly exposed to the public, even in her own house, would not be a subject of Fourth Amendment protection. 427 U.S. at 42, 96 S.Ct. 2406. Thus the last word spoken by the Supreme Court in this field during its October 1975 Term indicates that in accord with *Ex parte Jackson, supra,* the sender or the recipient of mail does not have a reasonable expectation of privacy with respect to the information on the outside.

Perhaps the closest modern Supreme Court case is *United States v. Van Leeu-*

*wen,* 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282. There respondent sent two packages by first class mail from Mt. Vernon, Washington, to Van Nuys, California, and to Nashville, Tennessee. The postal clerk told a policeman present in the Post Office that he was suspicious of the packages and the policeman noticed that the return address on the packages was that of a vacant housing area of a nearby junior college. This information was transmitted to the Bureau of Customs in Seattle, Washington, and the Customs officials then learned that the addressee of one package was under investigation in Van Nuys for trafficking in illegal coins, and that the second addressee was under investigation in Nashville, Tennessee, for the same crime. This Court reversed the defendant's conviction on the ground that the coins were improperly admitted in evidence because a timely warrant had not been obtained, but the Supreme Court in turn reversed us. Its opinion first noted that as established in *Ex parte Jackson*, letters and sealed packages cannot be opened without a warrant, although "there outward form and weight" can be inspected. 397 U.S. at 251, 90 S.Ct. 1029.

*Van Leeuwen* pointed out that first class mail is not beyond reach of inspection and that a fictitious return address plus other suspicious circumstances justified the reten-

---

**10.** As the district court noted below, this "Circuit has held that there is no reasonable expectation of privacy as to the fact that telephone calls were placed on particular dates to particular phone numbers from a home * * * telephone" (422 F.Supp. at 270 n. 19). *United States v. Baxter*, 492 F.2d 150, 167 (9th Cir. 1973), certiorari denied, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292; *United States v. Fithian*, 452 F.2d 505, 506 (9th Cir. 1971). The district court drew the following distinction between telephones and the mail: "While one desiring to protect his privacy may be put to a choice as to whether or not to install a telephone, there are few alternatives to the mail" (422 F.Supp. at 270–271). But if a sender wishes to avoid the mail cover, he simply may refrain from using his return address. Moreover, since the mail covers are subject to regulations (and have been the theme of three Congressional hearings in a decade), the sender must be presumed to know of the possible existence of a mail cover upon the mail of his addressee.

Therefore, we find the district court's plea that "in a free society, citizens should be left at least one unfettered means of communication which cannot be invaded without the showing of probable cause necessary for a search warrant" (422 F.Supp. at 271) to have a defective assumptive premise.

As with telephonic pen registers, the contents of the letters are not disclosed, nor does a mail cover encroach upon the privacy upon which one justifiably relies. Therefore, there has been no search or at least no unreasonable search within the meaning of the Fourth Amendment. *Hodge v. Mountain States Tel. & Tel. Co.*, 555 F.2d 254, 256–257, 266, 267 (9th Cir. 1977) (majority and concurring opinions). It is certainly more plausible to expect privacy to be invaded when a communication must pass through many hands than when it is transmitted by an electronic pen register system. See also *United States v. Baxter*, 492 F.2d 150, 167 (9th Cir. 1973).

tion of the packages for investigation without a warrant. Because there had been "no possible invasion of the right 'to be secure' in the 'persons, houses, papers and effects' protected by the Fourth amendment against 'unreasonable searches and seizures' ", the inspection of the outside of the first class mail was held not to disturb its privacy. 397 U.S. at 252, 253, 90 S.Ct. at 1032. Applying *Van Leeuwen* to a mail cover induced by appropriate reasons given by the requesting agency means that the mail cover "cannot be said to be 'unreasonable' within the meaning of the Fourth Amendment." 397 U.S. at 253, 90 S.Ct. at 1033.

■ In his above-mentioned article, Professor Stone has concluded that a warrantless search or seizure under the Fourth Amendment is only unreasonable "if it poses a relatively serious threat to [one's] privacy" (*id.* at 1212). Here the senders' placement of their names and addresses on the mail in question waives any privacy claim because the information would foreseeably be available to postal employees and others looking at the outside of the mail. Certainly the defendant could not keep that information invisible, and yet the Fourth Amendment only bars intrusions upon a person's "reasonable expectation of privacy." *United States v. Dionisio*, 410 U.S. 1, 8, 14, 93 S.Ct. 764, 35 L.Ed.2d 67. Here it cannot be said that there was any governmental intrusion into defendant's home, hotel room or similar place of solitude. Senders knowingly exposed the outsides of the mail to postal employees and others, and defendant could not keep those areas private. This is not a situation where an individual has attempted to control information about himself, nor are all practices of the Government in seeking information about a person unreasonable under the Fourth Amendment. Defendant has not

satisfied us that this particular mail cover was unreasonable. See note 10, *supra*.

In supporting affirmance, the earliest case relied upon by *amici* is *Ex parte Jackson, supra*, but there the Court excepted the examination and inspection of the "outward form" of mail from the scope of the Fourth Amendment. Thus the Court was protecting the contents of letters and sealed packages from examination and inspection. This is made clear because the opinion stated sealed items were to remain "closed" against inspection. See 96 U.S. at 733. In addition, Justice Field stated that postal regulations cannot "permit an examination *into* letters or sealed packages subject to letter postage, without warrant" but may be enforced "as from the parties receiving the letters or packages * * * (emphasis supplied). 96 U.S. at 835.[11] Postal regulations first authorized the use of mail covers in 1879, only one year after *Ex parte Jackson* was decided. Postal Inspection Hearings at 46. Certainly the draftsmen of those regulations must have intended to fit within the strictures of that already famous mail case. Indeed Chief Postal Inspector Cotter recently explained to a House subcommittee that *Ex parte Jackson* was interpreted by the postal authorities from the beginning as permitting mail covers. *Id.* at 49. In his May 1975 testimony to the subcommittee, Cotter also reviewed the leading court decisions approving mail covers until then. *Id.* at 49, 50.

■ Throughout their brief, *amici* endeavor to show that mail covers can be abused. When such a case occurs, the Fourth Amendment may be implicated, but as shown elsewhere in this opinion, there was no such abuse here. *Amici* also contend that this mail cover violated the rights of senders of the mail. They fail to realize that it was requested as part of the investigation of defendant, not his correspondents.

11. At oral argument, counsel for *amici* cited *United States ex rel. Milwaukee Publishing Co. v. Burleson*, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704, apparently relying on Justice Holmes' dissent that "while it [the United States] carries it [postal service] on the use of the mails is almost as much a part of free speech as the right to use our tongues * * * " (at 437, 41 S.Ct. at 363.). Nothing in that passage denigrates from the inspection carried on here under the imprimatur of *Ex parte Jackson, supra*, which is twice cited with approval in Justice Brandeis' companion dissent in *Milwaukee Publishing Co.*, at 430, 431, 41 S.Ct. 352.

At any rate, only the senders would be entitled to raise any question as to intrusion into their Fourth Amendment rights. *Alderman v. United States*, 394 U.S. 165, 171–172, 89 S.Ct. 961, 22 L.Ed.2d 176; *United States v. Lisk*, 559 F.2d 1108, 1110, 1111. (7th Cir. 1977). And none of them has complained.

This mail cover was not directed at the contents of postal cards or the contents of second, third or fourth class mail, as *amici* fear (Br. 21).[12] Moreover, only an established federal agency was requesting the mail cover here, so that *amici* cannot properly argue that this mail cover permits snooping by obscure local agencies (cf. Br. 32).[13] Likewise, the *amici* are wrong in asserting that this mail cover would include mail addressed to a "Mr. Carson" (Br. 42), for, in addition to Choate, it was only to apply to mail addressed to "CARSON AND CHOATE SURFBOARDS," thus incidentally including Carson only when his business with Choate was involved. Nor has Carson protested this measure.

■■ Much of *amici*'s attack on this mail cover is on the just-dismissed basis that the postal regulations are unconstitutionally vague and over-broad (Br. 30–42). To the extent that overbreadth and vagueness, other than what has been raised to us, might conceivably exist, this matter was not raised in the district court and therefore will not be considered on appeal. Our function is not inquisitorial. *United States Steel Corp. v. Train*, 556 F.2d 822, 839 (7th Cir. 1977). However, it should be noted, as even *amici* recognize (Br. 30, 44, 45), that the postal regulations were tightened in

1965 as a result of Congressional hearings that year. After the more rigid regulations issued in 1965, Senator Long, chairman of the subcommittee that had considered mail covers, expressed his satisfaction with them, while warning that his subcommittee would renew its push to outlaw mail covers completely if the new regulations were ignored, violated or abolished. Long, The Right to Privacy: The Case Against the Government, 10 St. Louis Univ. L.J. 1, 25 (1965). Through that warning and the routine introduction of bills thereafter threatening to abolish this investigative tool, Congress has in effect established itself as a watch-dog to prevent mail cover abuse.

*Amici* quote from a Note entitled Invasion of Privacy: Use and Abuse of Mail Covers in 4 Columbia Journal of Law and Social Problems 165, 175–176 (1968) (Br. 23–24), but that passage concerns whether mail covers violate statutory prohibitions against delaying the mail (18 U.S.C. §§ 1701, 1702 and 1703), a matter not raised here. The Note does say that the monthly number of mail covers "is now low" and that the 1965 revisions in the postal regulations "covered virtually all objections that had been theretofore raised," thus stifling prior Senatorial criticism (*id.* at 165, 173–174).

Throughout their brief, *amici* rely on the Hearings on Invasions of Privacy (Government Agencies) before the Senate Judiciary Subcommittee on Administrative Practice and Procedure, 89th Cong., 1st Sess. (1965) (Invasions of Privacy). Instead of supporting *amici*, those hearings actually support

12. The information requested is transmitted to the requestor on form POD 2009. Five columns of information are given detailing the information on the outside of mail: addressee, sender, return address, place and date of postmark and class of mail. Photocopies of the exterior service of the covered mail are not forwarded to the requestor. Thus *amici's* concern that handwriting, fingerprints or other types of physical evidence could be transmitted to the requestor is without foundation.

13. In addition, the only law enforcement agencies which may request mail covers are those agencies "one of whose functions is to investi-

gate the commission or attempted commission of acts constituting a crime." 39 C.F.R. § 233.-2(c)(4).

The *amici* also bemoan the scope of those authorized to approve mail covers. However, a postal inspector in charge can only delegate his authority to no more than three designees, and the delegation must be in writing for mail covers within his district. The Chief Postal Inspector, the only person authorized to grant mail covers (39 C.F.R. § 233.2(f)(3)), also can only formally delegate authority and then to a tightly limited number of designees. 39 C.F.R. § 233.2(d)(1).

the Government's position. Thus H. B. Montague, then Chief Postal Inspector of the Post Office Department, testified that the Post Office Department tries to restrict mail covers to 30 days and encourages outside agencies to restrict them to 15 days. *Id.* at 88. Montague said that he believed requesting agencies were not on fishing expeditions because:

"There has to be some trust and mutual understanding among enforcement agencies or you would never get your work done. We have confidence in these other agencies. Up to now I have had no reason to question or distrust any of them.

\* \* \* \* \* \*

"I think any law enforcement agency, when they make an investigation, has a good reason for doing it and that there is some suspicion a crime has been committed. They don't just go out without having some idea that a violation has been committed."

Montague also told the Senate subcommittee that the Post Office had not received complaints of mail cover abuses, probably because the requesting agencies are in law enforcement work and "are dedicated to the same principles we are. They take the same oath of office that we take, and we have found no reason to not have confidence and trust in them, and we do." He added that law enforcement agencies do not put in indiscriminate requests for mail covers. (*Id.* at 89.) In a table covering the period of 1960 through 1965 supplied by the Postmaster General to subcommittee Chairman Long on May 3, 1965, it was stated that postal inspectors denied a Bureau of Customs request for a mail cover in 1960 and two such requests in 1964 (*id.* at 341). The table does not cover July 1972 when the instant mail cover was issued. Far from seeking a plethora of mail covers, the Bureau of Customs sought only one mail cover in July 1973 and five in July 1974.[14] Hearings on Surveillance before the House Judiciary Subcommittee on Courts, Civil

Liberties and the Administration of Justice, 94th Cong., 1st Sess. (1975) (Surveillance) 332, 334.

In May 1965 the Postmaster General sent the Senate subcommittee excerpts from confidential instructions to postal inspectors relating to mail covers, providing as follows:

### "OUTSIDE AGENCIES

"It is important that agents of outside agencies fully understand that the purpose of a mail cover is to assist them in apprehending fugitives or to give them leads in other cases in which they are investigating violations of law and that mail cover information is restrictive and must be treated confidentially.

Mail cover information must not be given to private investigators nor furnished in civil action cases. Mail covers are not permitted in routine security investigations for clearance of an individual, but are allowed in suspected espionage cases or on other matters inimical to the interests of the United States.

Refer all requests for mail covers or extension of existing covers from outside agencies to division headquarters for consideration and action by the inspector in charge or his immediate designee. If a verbal request is received direct the requestor to submit it in writing.

### POSTAL INVESTIGATIONS

"Prior approval by inspectors in charge is not required in our own investigations; however, good judgment must be exercised. The number of mail covers in effect must be reduced to the absolute minimum, and must be strictly controlled. Confine requests to a 30-day period or less. Avoid indiscriminate use of this important investigative technique.

### "SECTION 831.44, POSTAL MANUAL

.44 MAIL COVER. Requests by postal inspectors in charge and postal inspectors for information regarding the addresses, return addresses, or postmarks on mail

---

14. We have not been cited to any statistics for July 1972, when the present mail cover was authorized.

must be treated in strict confidence and complied with carefully and accurately. In obtaining the information, do not delay delivery of the mail. (See 311.6 and 311.7.)" Invasions of Privacy at 339. These excerpts tend to show that the abuses conjured up by *amici* are more ephemeral than real.

In an effort to show mail cover abuses, *amici* have been able to find only one example, and this is a mail cover in the nebulous field of national security rather than the more specific area of gathering information concerning a crime. Thus in *Paton v. La Prade*, 524 F.2d 862 (3d Cir. 1975), plaintiff, Lori Paton, wrote a letter intended for the Socialist Labor Party and addressed to the Socialist Workers Party on whom a mail cover was in effect, resulting in an abortive investigation of that plaintiff by an FBI agent, but clearing her of any wrongdoing. The Third Circuit did not pass upon the validity of the mail cover (at 872), and Chief Postal Inspector Cotter explained that the mixup occurred from "human error" (Surveillance at 320). Nobody has asserted that human error or any kind of error was involved in defendant's mail cover.

Similarly inapt is *Stanford Daily v. Zurcher*, 353 F.Supp. 124 (N.D.Cal.1972), affirmed, 550 F.2d 464 (9th Cir. 1977), certiorari granted, —— U.S. ——, 98 S.Ct. 762, 54 L.Ed.2d ——, relied upon by *amici* (Br. 12–13). There a warrant to search the premises of a university newspaper for photographs of demonstrations was invalidated because the newspaper was not suspected of any offense. Here the mail cover target was reasonably thought to be importing cocaine from South America, thus justifying the 30-day mail inspection. In *Piazzola v. Watkins*, 442 F.2d 284 (5th Cir. 1971) (*Amici*'s Br. 15 n. 12), Troy State University officials searched for narcotics in the college rooms of the two student plaintiffs without warrants or consent. By no stretch of the imagination can such a search be analogized to this mail cover. See also *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856. Finally, in *United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (*Amici*'s Br. 37–38), government agents had engaged in wiretaps involving the domestic national security. Quite foreseeably, the Court applied *Katz* and held that search warrants were required because of "the potential danger posed by unreasonable surveillance to individual privacy and free expression" (at 315, 92 S.Ct. at 2135.). As shown, those factors are simply not present here.[15]

*This Mail Cover Does Not Violate the First Amendment*

 The dissenting opinion rests on the Fourth Amendment insofar as the Constitution is concerned. The opinion below also never relied on the First Amendment, probably because it was only peripherally relied upon in the district court by defendant. Similarly, in this Court, defendant stresses his Fourth Amendment rights. Apparently taking that cue, *amici* also rely

---

**15.** *Amici*, in hornbook fashion, summarize the elaborate legal framework surrounding the issuance of search warrants (Br. 34–36):

(1) the requirement that the factual basis for the search be set forth under oath;

(2) any precise calculus for assessing the accuracy, reliability and sufficiency of the "reasonable grounds" which must be established to support the search;

(3) the requirement that the "reasonable grounds" which "demonstrate [that] the mail cover would . . . assist in obtaining information concerning the commission or attempted commission of a crime" consist of timely and not stale information;

(4) the requirement that the "reasonable grounds" which factually support the search constitute the nexus between the nature and scope of things to be seized and the underlying criminality, so as to avoid the inherently unreasonable "general search"; and

(5) the requirement of a proper return and inventory of the fruits of the search. (Footnotes omitted.)

But here this framework is of course a red herring. These elements of the legal mechanism which have been constructed to implement the Fourth Amendment are, of course, wholly irrelevant when the Fourth Amendment does not apply in the first instance. *United States v. Lisk, supra.*

principally on the Fourth Amendment. In mentioning the First Amendment, neither defendant nor *amici* have cited any mail case in their favor apart from *Paton, supra.* In any event, no First Amendment rights of defendant were violated. As seen, the only information being gleaned by the Bureau of Customs was material on the outside of Choate's incoming mail and packages. Such material certainly would not abridge Choate's freedom of speech. Indeed, like any other reasonable citizen, he could expect no privacy as to the outside of his incoming mail, and any "chill" on the exercise of First Amendment rights resulting from that "lack of privacy" is not significant enough to be constitutionally impermissible when, as here, the challenged activity does not concern the *substance* of a communication and fits within regulatory restrictions. See *United States v. Ramsey,* 431 U.S. 606, 620–623, 97 S.Ct. 1972, 52 L.Ed.2d 617; generally *Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154; *Donohoe v. Duling,* 465 F.2d 196 (4th Cir. 1972). Speech thought to promote a criminal scheme, such as encompassed by this mail cover, is hardly within the ambit of the First Amendment. Moreover, the practice of associating with compatriots in crime is not a protected associational right. See *Runyon v. McCrary,* 427 U.S. 160, 176, 96 S.Ct. 2586, 49 L.Ed.2d 415.

■ Nor may the associational rights of the senders be raised by Choate. *N.A.A. C.P. v. Alabama,* 357 U.S. 449, 458–460, 78 S.Ct. 1163, 2 L.Ed.2d 1488. Even if he could do so, there is absolutely no support in the record that an equality of interest between Choate and the senders would be anything other than a false equivalency. *Paton, supra,* at 873–874. This is because there is no support in the record for the theory that any of the senders who were actually subject to the mail cover, and whose identity was actually used in preparing the tax case against Choate, would, in fact, care that others knew of the fact of their "association with Choate". In any event, the record discloses that defendant did not raise senders' First Amendment rights in the district court [16] and therefore we need not squarely pass on his ability to raise the senders' First Amendment rights in a purely *jus tertii* manner.

*This Mail Cover Does Not Violate the Ninth Amendment*

■ Rather than covering necessary aids to criminal investigation, such as mail covers, the cases which recognize the right to privacy at least partially on Ninth Amendment grounds, have been described as neatly categorized into matters involving family and procreational activities. See generally, Wilkinson & White, Constitutional Protection for Personal Lifestyles, 62 Cornell L.Rev. 563 (1977). This case appears to fit into neither category. Rights under the Ninth Amendment are only those "so basic and fundamental and so deeprooted in our society" to be truly "essential rights," and which nevertheless, cannot find direct support elsewhere in the Constitution. *Griswold v. Connecticut,* 381 U.S. 479, 488–489, 491, 85 S.Ct. 1678, 1685, 14 L.Ed.2d 510 (Goldberg, J., concurring).

■ Perhaps that is why in her Cardozo lecture on "The Directions and Misdirections of a Constitutional Right of Privacy" [17] our colleague Judge Hufstedler initiated her search for the constitutional guarantees of that right with a specific constitutional provision: the Fourth Amendment (*id.* at 551–558). As there noted, the pertinent words from that Amendment guarantee that people shall be "secure in their * * * papers * * * against unreasonable searches * * *." It may be doubted whether the material collected from mail addressed to defendant before delivery to him was really from his papers. Even assuming so, only unreasonable searches are interdicted. As seen, this was not such a search. As Judge Hufstedler has stated:

---

16. Consequently, *amici* are also barred from advancing this ground.

17. 26 The Record, Ass'n of the Bar of the City of New York 546 (1971). The lecture concentrated on First and Fourth Amendment rights.

"The right to protect the autonomy of one's personality cannot be absolute, but it is nevertheless a fundamental constitutional right. In striking the balance between public interest and fundamental private rights, the weight is on the side of the private right unless there is strong justification in favor of the Government action, and the Government has chosen reasonable means for vindicating its overriding interest. When governmental action consists of protecting the constitutional rights of one group of private citizens against the competing rights to privacy of others of its citizens, the societal interests of each are similarly weighed against the other, except that the scale is not initially tipped as it is when the interests that are opposed are fundamental private rights and general public interest." *Id.* at 562.

From the information in the possession of the Bureau of Customs, there was "strong justification in favor of the Government action" in permitting this mail cover. Moreover, the Government "has chosen reasonable means for vindicating its overriding interest" in enforcing the narcotics laws. Therefore, assuming his standing, we cannot conclude that defendant's right of privacy, stemming from any provision of the Bill of Rights, was impermissibly overborne.[18]

*The Supreme Court's 1976 October Term*

■ We are reinforced in our conclusion that the mail cover on Choate was constitutional by cases decided by the Supreme Court at its past Term. Thus the inspections here are less intrusive than the screening of former President Nixon's papers which was recently upheld over right of privacy arguments based on the First, Fourth and Fifth Amendments. *Nixon v. Administrator of General Services*, 433 U.S. 425, 455–465, 97 S.Ct. 2777, 2796–2801, 53 L.Ed.2d 867. They are also less intrusive than the opening of international mail that just survived First and Fourth Amendment attacks. *United States v. Ramsey, supra.*[19] As in *Ramsey*, we conclude that any "chill" to defendant and his correspondents is not only minimal but wholly subjective in the light of the safeguards provided by the postal authorities. The information on the outside of envelopes and packages normally passes through so many hands, public and private, that a mail cover cannot be said to invade any constitutionally protected zone of privacy. Thus it is akin to the statutory drug patient identification requirement sustained in *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64, where the Court discussed and distinguished its prior cases in the various right of privacy areas.

Unlike the situation in *United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538, the notations on the outside of this mail were not made with "an expectation that the [exterior] contents would remain free from public examination," thus placing defendant outside the right of privacy protections in the Constitution.[20] No family sanctity problem exists here such as in *Moore v. East Cleveland*, 431 U.S. 494, 498–500, 97 S.Ct. 1932, 52 L.Ed.2d 531, where a municipal ordinance which prevented a grandchild from living in his grandmother's home was invalidated under the Due Process Clause of the Fourteenth Amendment.[21] Nor is the mail cover analogous to cases invalidating statutes that "burden the freedom to make [child-

18. The balancing undertaken herein accords with Craven, *Personhood: The Right to Be Let Alone*, 1976 Duke Law Journal 699.

19. This Supreme Court opinion reversed *United States v. Ramsey*, 176 U.S.App.D.C. 67, 538 F.2d 415 (1976) on which *amici* relied at oral argument.

20. For a detailed discussion of *Chadwick*, see *United States v. Berry*, 560 F.2d 861, 863–864 (7th Cir. 1977). Not being retroactive, *Chad-

wick* is inapplicable here. *United States v. Berry*, 571 F.2d 2 (7th Cir. 1978, on rehearing); *United States v. Reda*, 563 F.2d 510 (2d Cir. 1977); *United States v. Montgomery*, 558 F.2d 311 (5th Cir. 1977).

21. But compare *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14, upholding a statutory and regulatory procedure for removal of foster children from foster homes.

bearing] decisions" such as involved in *Carey v. Population Services International*, 431 U.S. 678, 687, 97 S.Ct. 2010, 2018, 52 L.Ed.2d 675.[22]

█ In this case, the record shows that the information being gleaned from the mail cover on defendant was being used only for legitimate government purposes, namely for enforcement of the narcotics and later the income tax laws. The mail cover was not an attempt to garner a complete profile of defendant. As with most people's mail, inspection of the exterior of envelopes and packages for thirty days would not enable the requesting authority to build up such a complete picture of the subject that it could be used to invade such intimately personal rights as protected by *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, and its spawn.

· The order granting the motion to suppress is reversed and the cause is remanded for further proceedings.

HUFSTEDLER, Circuit Judge, concurring and dissenting:

In an August 21, 1974 indictment, Choate was charged with income tax evasion for understating his income in 1970 and 1971, in violation of 26 U.S.C. § 7201. The Government intended to offer at trial Choate's amended returns for those years, which he filed in October, 1972, and documentary evidence tending to prove that Choate's expenditures were greatly in excess of his originally-reported income.[1]

Choate moved to suppress "all physical evidence sought to be introduced against him" on the theory that it was tainted by

illegal searches of his home conducted by a government informant in 1971. After an evidentiary hearing, the district court found that the Government had sustained its burden of proving that the taint of the illegal searches had been dissipated. The testimony at the hearing, however, revealed that during 1972, Choate had been subjected to a mail cover of all of his correspondence. The district court held that the mail cover was conducted in violation of applicable Postal Service regulations, that it constituted an unreasonable search and seizure in violation of the Fourth Amendment, and that the evidence must be suppressed. (*United States v. Choate* (N.D.Cal.1976) 422 F.Supp. 261, 263.) The district court also found, and the Government concedes on this appeal, that "all evidence sought to be introduced against the defendant in this case was derived from exploitation of leads derived from the illegal mail cover." (*Id.* at 271.)

The case presents singularly sensitive and difficult statutory and constitutional issues, involving as it does the extent to which the applicable statutes and the Constitution protect persons from searches invisible to the persons whose effects are searched and from the seizures of intangibles that lead to the discovery of tangible evidence. If Choate is unshielded by the Fourth Amendment from the Government's illegal and oppressive conduct in this case, none of us can be secure from similar, unannounced governmental invasions of areas in which we have a reasonable expectation of privacy.

The mail cover was secured by intentionally false statements made by the Customs

---

**22.** But compare *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484, upholding a state regulation which prevented two indigent women from obtaining abortions.

**1.** Choate admitted the underpayment and paid his back taxes. He initially moved to dismiss the indictment on November 1, 1974, for "discriminatory law enforcement" on the ground that the usual IRS policy is not to prosecute taxpayers who have voluntarily filed amended returns and paid their taxes prior to the institution of prosecution. The district judge instead dismissed the indictment because testimony at

that hearing revealed that the government had attempted to elicit information about Choate from his attorney through the agency of an undercover informant in August, 1972. This court reversed, finding no denial of the effective assistance of counsel because the informant told the attorney at the time of his covert purpose and offered to supply him with information about the government investigation. Thus Choate was not prejudiced. *United States v. Choate* (9th Cir. 1975), 527 F.2d 748, 751–52.

officer who wrote the request for the cover. The searches and seizures that followed were obtained in violation of the Fourth Amendment because no judicial warrant was obtained to authorize the intrusion into the privacy of Choate's mail, none of the jealously guarded exceptions to the warrant requirement exist, and the search was over-broad and thus in violation of the reasona-bleness clause of the Fourth Amendment.

I concur with the majority opinion only on the point that the taint of the illegal searches of Choate's home was sufficiently dissipated by intervening events to permit the use of the evidence thus obtained.

Some detail respecting the factual back-ground of this case is essential to an under-standing of the legal issues. According to a 1971 report of the California State Bureau of Narcotics Enforcement (BNE), Choate first came to the attention of law enforce-ment authorities when an undercover infor-mant for the BNE, one Thompson, alleged that Choate was involved in importing co-caine from Peru. Thompson was about to be indicted for his own narcotics dealings,

and he later asserted that he was promised leniency if he could "make a case" against Choate.[2] During April, 1971, he made a series of illegal entries into Choate's home to obtain evidence and also reported on Choate's alleged drug dealing.[3] He produc-ed a tin containing some marijuana and a bank statement from the Farmers and Mer-chants Bank. The latter was in the name of Choate's wife, with whom he was then living prior to their marriage, but Thomp-son alleged that Choate used it for his own transactions. Shortly thereafter, Thomp-son's services as an informant were termi-nated because his credibility was questioned due to his own legal difficulties. The case on Choate was then closed.

The 1971 BNE report was transmitted to the Federal Bureau of Customs, and on April 3, 1972, Agent Williams of Customs reopened its investigation of Choate.[4] It appears that Williams contacted Thompson at this time, but he reported that he had no information on Choate in addition to that in the 1971 report.[5] Williams began an inves-

2. Thompson was ultimately prosecuted and convicted in December, 1972. In a subsequent habeas corpus petition he alleged that his pros-ecution and imprisonment was unlawful as government agents had promised him that he would receive different treatment if he assisted them. He cited as an example of his compli-ance with his end of the bargain the tax prose-cution of Choate, claiming he had been told he could "take credit" for it. He asserted he had first brought Choate to their attention. Agent Orosco of the BNE also testified that he knew the purpose of Thompson's assistance was to "buy some insurance" for himself.

3. He reported that Choate had brought a large quantity of cocaine from Peru in early April 1971 and had returned for more, but was ar-rested while trying to exchange money on the black market. Thompson also informed the BNE that Choate had nothing to do with co-caine seized in the possession of a passenger on a flight from Peru to San Diego during the same month.

4. Williams testified that he had been given the file to review upon joining the Bureau of Cus-toms in March, 1972. He also stated that he had become interested in Choate because of the allegations of drug dealing in the BNE report. His description of the file's contents indicated that it contained the only substantive allega-tions of drug dealing.

5. Williams gave conflicting versions of his con-tacts with Thompson and their dates. In one affidavit he testified he first learned of Thomp-son "after May 1, 1972" and used him for narcotics investigations unrelated to Choate. (Affidavit of Lynn Williams, dated March 6, 1976.) In a second, he stated that he discussed Choate with Thompson in April, 1972. (Affida-vit of Lynn Williams, dated July 12, 1976.) At the hearing on July 13, 1976 he stated that his first conversations with Thompson occurred in early 1973 and that the earlier affidavits and prior testimony was erroneous. However, his testimony was that, whenever they spoke, Thompson told him he had no additional infor-mation to that in the BNE report. The version which has these events occurring in 1973 is less than credible as Thompson was then in federal prison, and Williams' role in the Choate inquiry was apparently over. It appears to be a later fabrication to bolster the government's conten-tion at the hearing that the IRS investigation was unblemished by contacts with Thompson.

Viewed from the perspective of whether Wil-liams' institution of the mail cover was justi-fied, neither version assists the government: either Williams made no attempt to update the 1971 BNE report prior to asserting that Choate was "currently" smuggling cocaine in 1972 or he in fact learned prior to making the request that the sole source of such reports knew of no new developments.

tigation of the extent of Choate's assets to see if they "coincided" with the amount of cocaine purportedly involved. He testified that one of his first steps was to investigate the Farmers and Merchants Bank account, but he discontinued this avenue of inquiry immediately upon learning that Choate was not in fact an authorized signatory on the account. Williams rapidly concluded that while he had found "lots of assets," he was "not having much luck in getting a seizure or coming up with a substantive case against Mr. Choate." Therefore, he went to the Internal Revenue Service (IRS)[6] and attempted to interest IRS Agent Sherrard in investigating Choate for tax evasion.[7]

Sherrard, however, declined to become involved in the case until after the Customs investigation ceased. Thereafter Williams continued his asset investigation and instituted a mail cover of all Choate's correspondence.[8] The mail cover revealed the identity of Choate's personal bank account and at least two creditors, Diner's Club and Carte Blanche. From these sources, Williams was able to obtain a great deal of information about Choate's expenditures which was ultimately turned over to the IRS.

In September of 1972, an official IRS investigation was opened with Agent Roach in charge. Roach testified that he made use of the information obtained through the mail cover, but that the Farmers and Merchants Bank account was of little use. The latter was used only after the fact that expenditures were made had been independently verified to ascertain that the pay-

ments had been made from checks drawn on that account. Those expenditures amounted to less than $500, while total expenditures by Choate for the period in question were over $60,000.[9]

I

*Taint of Thompson's Illegal Searches*

Choate presses the point that "all" the Government's evidence should be suppressed because of Thompson's illegal searches. We may assume for present purposes that the entries were illegal and the product of governmental misconduct. The question is whether the primary illegality led to the discovery of the evidence sought to be introduced or whether it was obtained through independent means. (*Wong Sun v. United States* (1963) 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441).

A simple examination of the facts as previously set forth demonstrates the remote relationship between the fruits of Thompson's illegal entries as embodied in the BNE report, and this tax evasion prosecution. The BNE report may well have contributed to Agent Williams' decision to reopen the narcotics investigation of Choate, as it suggested that he was a major trafficker in cocaine. However, the sole lead used by Williams was the bank statement which quickly proved unproductive. That bank statement was used again only after Choate's expenditures were known to the IRS to verify the mode of payment.

---

6. Mr. Williams testified that he "went to [Sherrard] because I was having trouble with the investigation. I was having trouble determining how Mr. Choate was smuggling the cocaine into the United States. I was not having much luck in getting a seizure or progressing with a substantive case against Mr. Choate and I'd come up with a lot of assets and so I went to IRS to see if they could have luck in the case."

7. Again there is a conflict as to the precise date of this meeting. Sherrard testified at an earlier hearing that it occurred in April, 1972. This information was confirmed in an affidavit by IRS Agent Emmett T. Roach, Sherrard's successor in the Choate investigation. At the hearing, Williams said he first met with Sherrard in "July or August of 1972" or "June or

July of 1972". In either event, his testimony was that the meeting occurred prior to his instituting the mail cover.

8. The cover was requested on July 19, 1972, and ran from July 25–August 25, 1972.

9. Roach also testified that most of Choate's expenditures were in cash and that some of the information respecting these expenditures had been obtained through investigation not derived from the mail cover—for example, the purchase of cars and a boat. Thus, in 1970 personal checks accounted for $3,400 in expenditures against total expenditures of $11,736, and in 1971 checks accounted for $6,639 while total expenditures were over $50,000.

Choate's primary contention is that, if the BNE report provided the impetus for re-opening the investigation of Choate and contributed to its vigor, all evidence obtained in succeeding investigations is tainted. This Circuit has consistently rejected such arguments and has held that only evidence specifically derived from illegal leads can be deemed tainted. Where the succeeding investigations produce evidence from independent sources, it may be introduced despite the original illegality. (*E. g., United States v. Cella* (9th Cir. 1977) 568 F.2d 1266, 1284–1286 (mere fact investigation is intensified not enough); *United States v. Sand* (9th Cir. 1976) 541 F.2d 1370, 1375–76 (nexus between illegally seized evidence and that sought to be suppressed must be shown irrespective of the degree of police illegality); *United States v. Cales* (9th Cir. 1974) 493 F.2d 1215, 1215–16; *United States v. Brandon* (9th Cir. 1972) 467 F.2d 1008, 1010 (test is not whether a "but for" relationship exists between the illegal search and later investigation but whether its fruits tended to significantly direct that investigation to the evidence in question); *United States v. Bacall* (9th Cir. 1971) 443 F.2d 1050, 1055–61 (original illegality must *"in fact"* lead to specific evidence contested); *Durham v. United States* (9th Cir. 1968) 403 F.2d 190. *See also United States v. Pike* (5th Cir. 1975) 523 F.2d 734; *United States v. Friedland* (2d Cir. 1971) 441 F.2d 855.)

While the ultimate burden of proof is on the Government to show the absence of taint, the defendant must first establish a factual nexus between the illegality and the challenged evidence. The mere establishment of an illegal search does not place upon the Government the burden of affirmatively proving that each and every piece of evidence is free from taint. (*United States v. Cella, supra,* contains a thorough discussion of this point.) Choate did not establish any factual or logical nexus between the BNE report and the subsequent evidence uncovered by Williams and Roach as to Choate's assets and expenditures, except for the Farmers and Merchants Bank statement. (*Alderman v. United States* (1969) 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176; *United States v. Cella, supra,* 368 F.2d at 1284; *United States v. Sand, supra,* 541 F.2d at 1375–76.) While that bank statement should, of course, be suppressed, and any evidence as to that account's use as a source of Choate's expenditures, it cannot be deemed to taint the other evidence of Choate's expenditures which was independently discovered through the mail cover, state motor vehicle records, and other sources.

## II

### *The Mail Cover*

A mail cover is a procedure by which the United States Postal Service segregates all mail sent to a particular addressee and records all information which appears on its outside cover and, in some cases, identifies the contents of second, third, and fourth class mail.[10] The recording in Choate's case was accomplished by a postal employee's

---

10. 39 C.F.R. § 233.2(c)(1) (1977):

 " 'Mail cover' is the process by which a record is made of any data appearing on the outside cover of any class of mail matter, including checking the contents of any second-, third-, or fourth-class mail matter as now sanctioned by law, in order to obtain information in the interest of (i) protecting the national security, (ii) locating a fugitive, or (iii) obtaining evidence of commission or attempted commission of a crime.
 Mail covers may also be instituted of persons believed to be engaged in violations of postal statutes. (*Id.* § 233.2(d)(2)(1).) The crimes being investigated must be felonies. (*Id.* § 233.-2(c)(3).) The present appeal involves only subsection (c)(1)(iii). The present regulations

were promulgated on March 12, 1975. They do not differ, however, in any material substantive respect from those applicable at the time of the Choate mail cover—June and July, 1972. (*See* The Matter of Wiretapping, Electronic Eavesdropping, and other Surveillance: Hearings before the Subcomm. on Courts, Civil Liberties and the Administration of Justice of the House Comm. on the Judiciary, 94th Cong. 1st Sess., Ser. No. 26, Part 1 at 326, 352–54 (1975) (hereinafter cited as "Hearings on Surveillance"). *See also* 40 Fed.Reg. 11579, 11580 (March 12, 1975).) For a detailed history of mail cover regulations *see* Postal Inspection Service's Monitoring and Control of Mail Surveillance and Cover Programs: Hearings before the Subcomm. on Postal Facilities, Mail and Labor Management of the House Comm. on Post Of·

listing on a form, for all first and fourth class mail received over a thirty-day period,[11] the addressee (three locations were covered), sender, return address, place and date of postmark, and class of mail.[12] (*See* 39 C.F.R. § 233.2(c)(1).) The information obtained through mail cover surveillance provides a data bank which is a potent investigative tool.

It is possible to learn the identities, addresses and frequency of contact of most of a person's correspondents through a one-month mail cover—including banks, creditors, affiliations with religious, political, educational, and voluntary organizations, publications received, accountants, and friends.[13] Because many of these correspondents maintain files on the addressee which can be discovered and used by the investigating agency (*e. g.*, bank accounts, *United States v. Miller* (1976) 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71), the mail cover used in combination with other techniques quickly makes the subject's life an open book to investigators.

Mail covers are unique in other respects. The subject of a mail cover is never apprised of the existence of this surveillance unless it is revealed to him in discovery proceedings. (39 C.F.R. § 233.2(g)(4).) In Choate's case, despite ample pretrial discovery motions, the mail cover's existence was revealed only inadvertently in the course of a hearing on a motion to suppress.[14] Many mail cover subjects will never learn of the existence of this surveillance because it will not result in litigation. (*See United States v. United States District Court* (1972) 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752.) The request, authorization, undertaking, and use of results of a mail cover occur wholly within the executive branch. This procedure, neither authorized nor controlled by any act of Congress, is articulated and controlled in the discretion of the Postal Service. No judicial officer is involved at any stage of the proceeding, and records are kept by the Postal Service only.[15]

fice and Civil Service, 94th Cong., 1st Sess., Ser. No. 94–39 at 46 (1975) (hereinafter cited as "Hearings on Postal Inspection Service"); Invasions of Privacy (Government Agencies): Hearings before the Subcomm. on Admin.Practice and Procedure of the Senate Comm. on the Judiciary, 89th Cong., 1st Sess. at 67–69 (1965) (hereinafter cited as "Hearings on Invasions of Privacy"). *See also* Note, Invasion of Privacy: Use and Abuse of Mail Covers, 4 Colum.J.L. & Soc.Problems 155, 170–75 (1968).

11. Thirty days is the maximum period for which a mail cover may be requested initially in cases other than those involving national security or breach of postal regulations (39 C.F.R. § 233.2(f)(4)), but they may be extended by renewal of the request. However, 120 days is ordinarily the maximum. (39 C.F.R. § 233.-2(f)(5).) Statistics prepared by the Postal Service for 1973 and 1974 reveal that most domestic mail covers averaged 30 days while national security mail covers averaged as many as 119.4 days. Letter of William J. Cotter, Chief Postal Inspector (March 14, 1975), Exhibits A & B in Hearings on Surveillance, *supra* note 10, at 332–35.

12. In other cases, a record has been made by photocopying the exterior (*United States v. Leonard* (2d Cir. 1975) 524 F.2d 1076, 1085 & n.4). This distinction is without a difference for Fourth Amendment purposes—*see* discussion *infra* at 201–202. However, we need

not consider, as amici suggest, the possible use of fingerprints or other data on the surface of mail revealed by photocopying because it was not employed against Choate.

13. The only correspondent exempted from a mail cover is the subject's attorney. However, his identity must be known in advance and identified to the Postal Service. (39 C.F.R. § 233.2(f)(2).) Other legal correspondence would presumably be covered. Choate's attorney noted at the hearing that he had not filed an appearance at that time and questioned how the government had gone about identifying him.

14. A motion for pre-trial discovery was made on November 4, 1974, but the existence of the mail cover was first revealed at the July 13, 1976 hearing—despite 39 C.F.R. § 233.2(g)(4) ("Any data concerning mail covers shall be made available to any mail cover subject in any legal proceeding through appropriate discovery procedures."). Agent Williams spontaneously revealed the existence of the mail cover in order to show that the cover, not Thompson's illegal searches, was the source of most of his investigatory leads.

15. Prior to 1965 reforms, these records were destroyed after two years. Subsequently the period has been extended to five and now eight years. 39 C.F.R. § 233.2(g)(5).

Postal regulations provide that any "law enforcement agency" [16] may obtain a mail cover by direct written application to members of the Postal Service's investigative division [17]—the Inspector General or 72 designees about the country. (Hearings on Surveillance, *supra* n.10, at 331.) The requesting agency is required to recite "the reasonable grounds that exist which demonstrate the mail cover is necessary to . . obtain information regarding the commission or attempted commission of a crime." (39 C.F.R. § 233.2(d)(2)(ii).) There is no requirement that the requesting agency attest to the truth of these grounds or produce evidence supporting them. Granting or denying a request is in the discretion of the Inspector General or his designee. (Hearings on Postal Inspection Service, *supra* n.10 at 52.) The meaning of reasonable grounds is undefined (*see* n.25 *infra*) and it appears that most requests are routinely granted if they seem to state reasons why a mail cover will prove helpful to the requesting agency.[18] Information is obtained on all correspondence—not just mail directly related to the stated purpose of the surveillance. Thus, in Choate's case, while the request was purportedly for purposes of identifying a South American return address, the Bureau of Customs was furnished with mail cover data as to Choate's domestic correspondents.[19] Finally, the information obtained is forwarded directly to the requesting agency, and postal records are destroyed after a period of eight years.

Far from being few in number, there were 4,528 other mail covers in effect during 1972 when Choate's was requested and 5,171 in 1973. The Bureau of Customs alone obtained 220 in 1973. (Hearings on Surveillance, *supra* n.10, at 332, 334.) In view of the fact that mail covers often lead to investigation of senders of mail as well as addressees, it can readily be seen that the rights of large numbers of citizens are involved. (*E. g., Paton v. La Prade* (3d Cir. 1965) 524 F.2d 862 (FBI investigated everyone who wrote to Socialist Workers Party); *Lustiger v. United States* (9th Cir. 1967) 386 F.2d 132 and *United States v. Schwartz* (3d Cir. 1960) 283 F.2d 107 (Post Office contacted all correspondents with mail fraud suspects to see if they had been defrauded).); *United States v. Leonard* (2d Cir. 1975) 524 F.2d 1076, revealed that approximately 150 persons who received mail from Switzerland without a return address were investigated by the IRS for possible income tax evasion and that the mail of many thousands was covered.

16. Law enforcement agencies include any federal, state, or local unit "one of whose functions is to investigate the commission or attempted commission of acts constituting a crime." (39 C.F.R. § 233.2(c)(4).) Thus, requests have been honored from such entities as the U.S. Coast Guard, the Department of Interior, the Royal Canadian Mounted Police, and the Departments of Labor, HEW, and Agriculture in addition to agencies more traditionally associated with law enforcement. (Hearings on Surveillance, *supra* note 10, at 334.)

17. The Postal Inspection Service is responsible for postal security (*see* 39 C.F.R. §§ 231–233), and it is the Postal Service's own law enforcement division and the oldest federal investigative agency. Its primary activities are investigation, arrest, and prosecution of those who break the postal laws. Thus, in 1964, the division made 12,006 arrests, resulting in 10,485 convictions. (Testimony of H. B. Montague, Chief Postal Inspector, Post Office Department in Hearings on Invasions of Privacy, *supra* note 10, at 66–67.)

18. The Inspector General testified that as to national security mail covers, there are no standards whatsoever and that the Postal Service would welcome Congressional "guidance" in that regard. (Hearings on Surveillance, *supra* note 10, at 314.) Mail cover disapprovals and approvals were as follows for 1973–75:

| | Disapprovals | Total Approved |
|------|--------------|----------------|
| 1973 | 137 | 5,171 |
| 1974 | 122 | 4,609 |
| 1975 | 191* | 3,699 |

(* three quarters only)

(Hearings on Postal Inspection Service, *supra* note 10, at 18, 238.)

19. Indeed, of all the information obtained, not one return address was outside the United States.

### 1. Postal Service Power to Institute Mail Cover Procedure

A preliminary question is whether the Postal Service has unconstitutionally exceeded its delegated powers in instituting the mail cover procedure and promulgating postal regulations, when the practice is unauthorized by any act of Congress.[20] However, we need not here resolve this important and difficult question.[21]

The Fourth Amendment aside, it is apparent here that the Government failed to comply with the applicable postal regulations. As this provides a basis for suppressing the evidence obtained from the mail cover, we need not reach the question of the validity of the regulations' promulgation as they afford no shield to the challenged conduct.

From the Fourth Amendment perspective, even where a practice is authorized by statute, if it purports to authorize a warrantless search, the constitutionality of the actual search is evaluated in terms of the Fourth Amendment. The statute's specifics become immaterial. (*Sibron v. New York* (1968) 392 U.S. 40, 59–62, 88 S.Ct. 1889, 20 L.Ed.2d 917 (no need to consider facial constitutionality of statute authorizing warrantless stop and frisks; rather Court will examine actual incident in light of Fourth Amendment). *See also United States v. United States District Court, supra,* 407 U.S. 297, 308–09, 92 S.Ct. 2125, 32 L.Ed.2d 752 (applying Fourth Amendment to search unauthorized by statute without reaching question whether executive branch has inherent authority to order warrantless wiretaps for national security purposes).) As I find the instant mail cover constituted an unreasonable search and seizure in violation of the Fourth Amendment, I have no occasion to reach the question of the validity of the postal regulations.[22]

### 2. Compliance with Postal Regulations

In order to institute the mail cover of Choate, Agent Williams prepared a letter sent over the signature of his supervisor on July 19, 1972, which recited in pertinent part:

> "[Choate] is currently under investigation by this office for the suspected smuggling of large quantities of narcotics into the United States. CHOATE is currently organizing a large narcotic smuggling ring with the primary source located in South America. It is felt that CHOATE and the source in South America correspond by mail. Return addresses on mail would be of aid in identifying the source in South America and other members of the smuggling ring."

---

**20.** In its promulgation of postal regulations relating to mail covers, the Postal Service recites that it finds statutory authority for this and other activities of the Postal Inspection Service (Posting of Wanted Posters and Rewards, Withdrawal of Mail Privileges from Abusers of the Mails) in 39 U.S.C. §§ 401, 404, and 410. (*See* 39 C.F.R. § 233 at 56 (1977).) None of these statutes purports to give any express authority for mail covers. Indeed, counsel for the Postal Service has admitted that no statutory authority exists for the practice. (Hearings on Invasion of Privacy, *supra* note 10, at 82: "There is no statutory authority for mail covers nor is there any prohibition in the law against them." (Testimony of Louis J. Doyle, General Counsel of the Post Office).) The Postal Service has simply relied upon its general authority and upon its long-time practice in undertaking mail covers. Unauthorized and illegal assumptions of power become neither authorized nor legal by reason of habitual assertions of such power, even when the habit is long-standing. (*See, e. g., Almeida-Sanchez v. United States* (1973) 413 U.S. 266, 93 S.Ct. 2535, 37

L.Ed.2d 596; *United States v. Ortiz* (1975) 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623.) "[A]n agency may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate." *FMC v. Seatrain Lines, Inc.* (1973) 411 U.S. 726, 745, 93 S.Ct. 1773, 1785, 36 L.Ed.2d 620.) No court has yet had occasion to consider whether the mail cover procedure exceeds the statutory authority of the post office.

**21.** It poses substantial issues with broad ramifications for a variety of agency practices. (*See* discussion in notes 10 and 20, *supra*.) Of course, the Congress cannot by acquiescence render constitutional an unauthorized assumption of power by the executive. (*Cf. Almeida-Sanchez v. United States, supra,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596.)

**22.** In my view, even if the regulations had been authorized by Congress they would be void as violative of the Fourth Amendment.

On the basis of this letter, the Postal Service instituted the mail cover, which lasted from July 25 through August 25, 1972. Choate contends that this request failed to comply with 39 C.F.R. § 233.-2(d)(2)(ii) (1977) because on its face it does not state "*reasonable grounds that exist which demonstrate the mail cover is necessary to . . . obtain information regarding the commission or attempted commission of a crime*" and because the recitations were untrue and known by Agent Williams to be untrue at the time he made the request. I am aware of no prior challenge to a mail cover's validity based upon failure to comply with postal regulations. We must therefore determine whether the asserted grounds may serve to vitiate the mail cover, and if so, what evidentiary consequences follow.

There is no provision in the regulations for collateral attack on a mail cover request by a subject.[23] However, in a statement submitted to the House of Representatives' Committee on Post Office and Civil Service, which was investigating the use of mail covers, the Chief Postal Inspector for the United States Postal Service said:

" . . . The grounds upon which the need for a mail cover is based must be specific in order to permit a determination that the essential requirement is met. *Mail covers cannot be authorized for exploratory purposes.*

"The sufficiency of a mail cover request is the heart of the mail cover regulations. It is the Postal Service and, in particular, the Chief Inspector who bears all responsibility as to whether approved requests are in keeping with the regulations. The request becomes a permanent part of the mail cover file which must be made available through appropriate discovery procedures in any legal action. *The subject of the mail cover would thus be able to challenge not only the propriety of the judgment of the postal official imposing the mail cover, but also the truthfulness and sufficiency of the statements filed by the authority requesting the mail cover.*"[24]

The Inspector General's statement suggests that while there is no prior judicial review of mail cover requests, they are challengeable in subsequent judicial proceedings on grounds that (1) the averments did not on their face state "reasonable grounds" and (2) the averments were untruthful. (*See also Oliver v. United States* (8th Cir. 1957) 239 F.2d 818, 823 ("The question of unreasonable search and seizure in postal inspection is entitled to be resolved, where legislative measures or administrative regulations exist, by such valid limits as have been fixed and held out thereunder as constituting the extent of mail opening and examination in which the Post Office Department will engage.").)

For present purposes, I am content to assume without deciding that the Choate mail cover request states reasonable grounds[25] within the meaning of 39 C.F.R.

---

**23.** The Postal Regulations do provide that "[i]f the Chief Postal Inspector, or his designee, determines a mail cover was improperly ordered by a Postal Inspector in Charge or his designee all data acquired while the cover was in force shall be destroyed, and the requesting authority notified of the discontinuance of the mail cover and the reasons therefor." (39 C.F.R. § 233.-2(g)(3).) This appears however to allow only for internal postal review of improvidently granted requests prior to conveying the information to the requesting agency. Similarly the review procedures in *id.* § 233.2(h)(i) appear directed toward limitation of requesting authority appeals from adverse responses to mail cover requests, not to later attacks by subjects.

**24.** Hearings on Postal Inspection Service, *supra* note 10, at 52. (Statement of William J. Cotter, Chief Postal Inspector, United States Postal Service) (emphasis added).

**25.** The question of whether the averments facially complied with 39 C.F.R. § 233.2 is made difficult by the fact that "reasonable grounds" are nowhere defined. It is clear that they were not viewed as the equivalent of "probable cause," because the Post Office has continuingly opposed institution of such a requirement on the grounds that probable cause could not ordinarily be shown. (Hearings on Surveillance, *supra* note 10, at 302, 310–11, 327 (mail covers enable the development of probable cause); Hearings on Postal Inspection Service, *supra* note 10, at 49–52, 196–97 (Justice Department asserts its opposition to probable cause requirement.).) On the other hand, the tighten-

§ 233.2(d)(2)(ii),[26] as in my view a mail cover request may be collaterally attacked for untruthfulness on the same basis as an affidavit in support of a search warrant.[27] The facts developed at the evidentiary hearing in the district court clearly reveal that the statements in the request were false and known by Williams to be false when made. Hence, I would hold that the underlying falsity vitiates the mail cover request irrespective of its facial validity and that this renders the resulting surveillance illegal and requires suppression of the evidence under the compulsion of authority in this Circuit. (*United States v. Caceres* (9th Cir. 1976) 545 F.2d 1182.)[28]

A prepared statement of the Inspector General at Senate hearings cannot control our view of the grounds on which a criminal defendant may attack the validity of a mail cover request. It does not constitute an authoritative interpretation, nor do the regulations themselves provide for collateral attack. However, it is highly persuasive as an opinion of the sole entity involved with the authorization and review of mail covers, particularly as it suggests its own belief that Postal Service approval is not intended to be a conclusive determination that a mail cover request is valid.

Some review of the veracity of the "reasonable grounds" stated in a mail cover request is dictated by similar considerations to those which have led most courts of appeals to authorize attacks on the validity of search warrants because of false statements by government agents in the sup-

ing of mail cover procedures following the 1965 hearings and recent statements by the Chief Postal Inspector indicate that they are no longer to be used for mere fishing expeditions and the government's assertion that a request need merely state "*that* reasonable grounds exist" is without merit. (*See* Hearings on Postal Inspection Service, *supra* note 10, at 51–52; Hearings on Surveillance, *supra* note 10, at 304–05 ("mail covers cannot be authorized for exploratory purposes.") *See also id.* at 324–27 (discussing history of 1965 changes).)

It would appear that at minimum the request must allege the commission or attempted commission of a specific felony and that a mail cover would logically assist in obtaining evidence relevant to its solution. The district judge apparently believed that in addition the agency must specify the factual grounds underlying its allegations. (*United States v. Choate* (C.D.Cal.1976) 422 F.Supp. 261, 266–67 (insufficient to recite mere "feeling" mail cover would be productive in view of history of Congressional concern leading to tightening of postal regulations).) This position is undercut by the fact that such specification has not been *required during the ten years that the regulations have been effective*, and by the fact that legislation which would require such a showing has been introduced in Congress.

**26.** I do not agree that our review of the facial validity of the request would be limited under the rationale of *United States v. Ventresca* (1965) 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684; or *United States v. Spearman* (9th Cir. 1976) 532 F.2d 132. That doctrine of liberal construction is justified in the search warrant context by a desire to defer to the magistrate who has previously reviewed the request. This follows from hesitation to reverse on appeal his finding of probable cause on which the government has relied. It is inapplicable to review the judgment of a law enforcement agent of the Post Office who is reviewing the self-serving averments of another law enforcement officer. To the extent that a liberal construction is warranted, it is because there is no reason to expect the laymen who review mail cover requests to act as if they were neutral magistrates *or as if they had training which should* lead them to distinguish "it is felt" from "facts lead us to believe." This in turn reveals the inadequacy of the current procedure for Fourth Amendment purposes.

**27.** We should not spend this court's time analyzing the meaning of the term "reasonable grounds" in postal regulations which purport to authorize conduct violative of the Fourth Amendment. (*See Sibron v. New York, supra*, 392 U.S. at 59–62, 88 S.Ct. 1889.)

**28.** The district judge did not thus characterize his holding that the Choate mail cover request failed to state reasonable grounds. However, *implicit in his discussion of the fact the 1965 regulation tightening was intended to prevent fishing expeditions* and that here the request was "without tangible justification," is the notion that the request was inadequate because it was in fact a fishing expedition. 422 F.Supp. at 264–67, 271. *United States v. New York Telephone Co.* (1977), 434 U.S. 159, 166 n. 8, 98 S.Ct. 364, 369, 54 L.Ed.2d 376 ("The prevailing party may defend a judgment on any ground which the law and the record permit that would not expand the relief it has been granted.").

porting affidavits which led to their issuance:[29]

". . . it must be recognized that law enforcement agents presenting evidence to magistrates could make a mockery of the magistrate's role if, in the necessarily ex parte proceeding, they could freely employ false allegations in order to secure the warrant. The same would likewise be true if the agents could, with impunity, draft affidavits with utter recklessness as to truth or falsity. In either instance there would be a lack of good faith in the performance of the agent's duty to the judicial office."

*United States v. Luna* (6th Cir. 1975) 525 F.2d 4, 8.)

As this Circuit has recognized, collateral attacks on the veracity of affidavits in the search warrant context are necessary to further "a basic purpose of the [Fourth] Amendment and the exclusionary rule, namely the deterrence of lawless police ac-tion." (*United States v. Damitz* (9th Cir. 1974) 495 F.2d 50, 55–56.)[30] This is true despite the fact that the affidavits have been scrutinized by a neutral magistrate prior to issuance of the warrant because of the ex parte nature of the proceeding and the impossibility of otherwise preserving the defendant's rights.

In the context of the Postal Service mail cover procedure, the need for post-surveillance judicial review is even more pronounced, because no judicial officer has ever previously been interposed to evaluate the governmental averments as to the need for a search. The ex parte procedure has consisted solely of one government law enforcement agency representing to another that the surveillance will likely produce useful evidence. In most cases, the representations are accepted without question, based on the trust reposed by the Postal Inspection Service in coordinate law enforcement agencies. (Hearings on Postal Inspection

---

**29.** All courts of appeals have assumed or decided that a defendant is entitled to a hearing at which he may attack the validity of governmental affidavits. Differences of opinion exist, however, as to whether negligent and material or non-material but intentional misstatements may vitiate the warrant. The Supreme Court has not ruled on the question. (*See Rugendorf v. United States* (1964) 376 U.S. 528, 531–33, 84 S.Ct. 825, 11 L.Ed.2d 887 (need not decide if Court can look behind facial validity of search warrant where there was no showing of bad faith or misrepresentations); *United States v. Branch* (1976) 178 U.S.App.D.C. 99, 102 & n. 2, 545 F.2d 177, 180 & n. 2 (hearing below found evidence of falsity non-credible; unnecessary to determine rule for circuit); *United States v. Belculfine* (1st Cir. 1974) 508 F.2d 58, 60–64 (hearing required when defendant makes preliminary showing of knowing misstatements; "no supportable alternative to suppression of evidence . . . based on an affidavit containing an intentional, relevant, and nontrivial misstatement."); *United States v. Gonzalez* (2d Cir. 1973) 488 F.2d 833, 837–38 (misstatement was non-material and, at worst, negligent; unnecessary to resolve applicable standard); *United States v. Vento* (3rd Cir. 1976) 533 F.2d 838, 858–59 (immaterial and unintentional misstatement; unnecessary to choose between applicable standards); *United States v. Lee* (4th Cir. 1976) 540 F.2d 1205, 1208–09 (where officer perjures himself or proceeds in reckless disregard of true facts and affidavit is materially inaccurate, it may be attacked); *United States v. Astroff* (5th Cir. 1977) 556 F.2d 1369, 1371–74 (5th Cir. rule permits attack even if material misstatements made negligently); *United States v. Luna* (6th Cir. 1975) 525 F.2d 4, 6–9 (affidavit may be impeached for "knowing use of a false statement with intent to deceive" whether or not material; not for negligent material misrepresentation); *United States v. Carmichael* (7th Cir. 1972) 489 F.2d 983, 988–89 (en banc) (can impeach affidavit upon a showing of misrepresentation of a material fact or any intentional misrepresentation); *United States v. Marihart* (8th Cir. 1974) 492 F.2d 897, 899–902 (adopting Seventh Circuit standard), *accord: United States v. Luciow* (8th Cir. 1975) 518 F.2d 298, 301; *United States v. Harwood* (10th Cir. 1972) 470 F.2d 322, 324–25 (material misstatement will vitiate warrant).)

**30.** In this Circuit, a defendant is entitled to an evidentiary hearing upon making a substantial showing of falsehoods in the affidavit. (*United States v. Damitz, supra,* 495 F.2d at 53–54. Accord: *United States v. Taxe* (9th Cir. 1976) 540 F.2d 961, 967; *United States v. Moore* (9th Cir. 1975) 522 F.2d 1068, 1072; *United States v. Harris* (9th Cir. 1974) 501 F.2d 1, 5–6 & n.7.) It has not been necessary to reach the question of what type of misstatement will invalidate the warrant. (*Damitz, supra,* 495 F.2d at 55 (where misstatements were made by an informer and were not material, warrant is valid if remainder of affidavit is true and suffices to show probable cause).)

Service, *supra* n.10, at 16 (no evidence required, just "assurances" of coordinate agencies); *see also* Hearing on Surveillance, *supra* n.10, at 322 (testimony of Chief Postal Inspector Cotter).) While I do not believe that such review suffices to validate the procedure for Fourth Amendment purposes, it is patently a minimal requirement. (*See Terry v. Ohio* (1968) 392 U.S. 1, 12–13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889, noting that application of the exclusionary rule in review of the manner of obtaining evidence serves the dual purposes of deterring government misbehavior and of preserving the "imperative of judicial integrity" as a "ruling admitting evidence in a criminal trial . . . has the necessary effect of legitimizing the conduct which produced the evidence.")

We need not concern ourselves with the questions whether a mail cover request could be attacked upon a less stringent showing than a search warrant affidavit, or about what standard of *scienter* and materiality is required, because facts established at the evidentiary hearing previously held show that all the material representations in the mail cover request were intentionally falsified by Williams.[31] In all the circuits which have reached the issue, intentional misstatement of material facts in an affidavit by a government agent serves to vitiate a search warrant,[32] and misstatements of the same nature in the mail cover request must render similarly illegal this mail cover.[33]

The mail cover request contained three material [34] representations: (1) that the requesting authority had reason to believe Choate was "currently" organizing a narcotics smuggling ring with a South American source, (2) that it further believed that the source and Choate corresponded by mail, and thus (3) that a mail cover would aid in identifying the source.

Williams had no "current" information on which he could assert that Choate was organizing a narcotics smuggling ring when he requested the mail cover on July 19, 1972. The only information to that effect was contained in Thompson's April, 1971, reports to the BNE which had been passed along to Customs. All efforts by Williams to obtain current information that would connect Choate with cocaine trafficking had failed (*see* notes and text at nn. 4–7, *supra*),[35] and Thompson had informed Williams that he possessed no more recent in-

**31.** The district judge found:

"Agent Williams specifically stated he 'was not having much luck getting a seizure or progressing with a substantive case against Mr. Choate.' Absent probable cause, therefore, he turned to the use of a mail cover for a warrantless fishing expedition. Before requesting the mail cover, he had approached the IRS with information he had been gathering so that a tax investigation could be undertaken. The IRS did not wish to proceed at that time, but invited him to return later following further investigation. It is clear that he was very interested in information on Mr. Choate's assets, although that justification was not given to the postal authorities." (422 F.Supp. at 271.)

**32.** The First, Fourth, Sixth, Seventh and Eighth Circuits will suppress evidence based upon a materially and intentionally inaccurate warrant (*see generally United States v. Belculfine; United States v. Lee; United States v. Luna,* all *supra* note 29); while the Fifth and Tenth Circuits will suppress even if the material misstatements were negligent (*see* cases discussed in note 29, *supra*). While this Circuit has not reached the issue, the reasoning in *United*

*States v. Damitz, supra,* makes it clear that if no portion of the affidavit is true, the warrant cannot stand. (495 F.2d at 54–55.)

**33.** The fact that Williams did not personally attest to the truthfulness of the request does not render the search warrant rule inapplicable. While the fact that the government agent has perjured himself in an affidavit has contributed to the willingness of courts to suppress evidence (*e.g., United States v. Belculfine, supra,* 508 F.2d at 62–63), it is the intentional abuse of process, rather than the breach of oath, which triggers application of the exclusionary rule.

**34.** The assertions that Choate was being investigated by the Bureau of Customs and that the crime involved was a felony were essential to obtain the mail cover, but were not material to the question whether reasonable grounds existed.

**35.** The fact that Choate had "many assets" could not logically prove current dealings as they could have been purchased with funds obtained at any time.

formation than that in the 1971 report.[36] Most significant is the fact that Williams felt he could not "make a substantive case" against Choate for drug dealing, and this actually caused him to take the step of going to Sherrard of the IRS before instituting the mail cover and suggesting a tax investigation.[37] Williams, in fact, testified that his reason for instituting the mail cover was to look for more assets; he said nothing about a purported South American connection.[38] Williams' testimony thus clearly revealed that he was fully aware at the time he made the mail cover request that he had no current information which indicated that Choate was organizing a smuggling ring.

There was no indication in any of the information in Williams' possession that Choate had ever corresponded by mail with a South American contact. The averment to this effect was pure speculation based upon the initial misstatement of fact.[39] Thompson's report indicated only that Choate had traveled to South America.

Finally, the essential predicate for the mail cover was the statement that it was expected that it would aid in identifying the South American source. Williams' own testimony revealed, however, that prior to instituting the mail cover he had turned his attention fully to "asset tracing" and had given up any attempt to make a substantive case against Choate. (See nn. 31 & 38,

supra.) This was the purpose of the mail cover—not finding a South American address. Thus, each material representation in the request was false and known to be false by Williams at the time it was made. It was a bare-faced abuse of the mail cover procedure to obtain information and pursue an investigation apparently outside his jurisdiction—asset tracing to establish a basis for an IRS prosecution—by reciting false material facts which, if true, would logically have justified the surveillance. (See 422 F.Supp. at 271.)

But for the false averments in the Choate mail cover request, the Postal Service would not have instituted the mail cover, and the resulting investigative leads would not have come to light. In this Circuit, where federal investigators intentionally fail to comply with applicable regulations governing a search, the evidence obtained from the search and its fruits must be suppressed. (United States v. Caceres (9th Cir. 1976) 545 F.2d 1182, 1187–88, as amended on denial of rehearing en banc (1977); see also United States v. Sourapas (9th Cir. 1975) 515 F.2d 295, 298.) The Government argues that this precedent should not apply on the ground that the request here in issue was made in "good faith" and that the Caceres doctrine should be held inapplicable to unintentional, good faith breach of federal regulations governing administrative

**36.** See note 5 supra. Even if Williams' testimony that he did not contact Thompson until 1973 is believed, it merely shows that prior to obtaining the mail cover Williams had not even attempted to update this year old information.

**37.** Williams testified: "I went to [Sherrard] because I was having trouble with the investigation. I was having trouble determining how Choate was smuggling the cocaine into the United States. I was not having much luck in getting a seizure or progressing with a substantive case against Mr. Choate and I'd come up with a lot of assets and so I went to IRS to see if they could have luck in the case."

**38.** Williams' testimony on direct respecting his investigations after the Sherrard meeting was as follows:
"Q. And did you also attempt to track further assets and expenditures of Mr. Choate?
A. Yes, I did.

Q. And how did you do that?
A. Let's see. I believe—yes. I requested a mail cover be placed on Mr. Choate.
Q. Which is what?
A. That's when we submit a letter to the Postal Inspector requesting they advise who is sending mail to Mr. Choate . . . . I believe I requested a 30-day mail cover on Mr. Choate. From that I determined that he was receiving mail from the United States National Bank. . . . ."

**39.** The government states that it is "obvious" that if a person is engaged in international drug smuggling, he communicates by mail with his contact. It is equally obvious that where there is no evidence of smuggling there is no reason to believe mail contacts are then in force.

searches. The misconduct here is much more excessive than the non-compliance in *Caceres,* which involved failure to obtain prior authorization for the search from proper parties.[40] Here Williams misled the Postal Service into conducting the search by false representations, thereby abusing the process and circumventing the precise purpose of tightening of the regulations in 1965 to prevent "fishing expeditions." On this ground the evidence obtained from the mail cover leads must be suppressed.

Despite my conclusion that non-compliance with applicable postal regulations constitutes a valid alternative basis for suppression of the evidence obtained from the mail cover, I find it necessary to reach the Fourth Amendment question. The Fourth Amendment was violated, whether or not there were reasonable grounds, because no warrant was obtained and the search was a general one.[41] In effect, the absence of compliance with the Fourth Amendment permitted the governmental duplicity to occur. This violation was effectuated by the Postal Service, not the Bureau of Customs, and the illegality of its conduct cannot be ignored simply because there was preceding illegality by Customs.

### 3. Fourth Amendment Considerations

#### A. Prior Case Law

The Government argues that resolution of the constitutional issue is controlled by earlier case law. While it is true that mail cover procedures have been upheld against a variety of attacks in the past, I do not view any of those cases as controlling.

The earliest cases did not reach the Fourth Amendment question. (*See Cohen v. United States* (9th Cir. 1967) 378 F.2d 751, 759–60 (defendant alleged violation of three mail tampering statutes, 18 U.S.C. §§ 1701–03, and an inhibition of his First Amendment rights);[42] *United States v. Schwartz* (3d Cir. 1960) 283 F.2d 107, 107–11 (defendant alleged violation of postal regulations and failure to comply with regulation permitting mail cover);[43] *United States v. Costello* (2d Cir. 1958) 255 F.2d 876, 881–82 (violation of 18 U.S.C. §§ 1701–1703 asserted).)[44]

Subsequent cases which did reach constitutional issues simply relied, without discussion, upon decisions in the earlier cases respecting alleged violations of statutes and regulations. Thus in *Lustiger v. United States* (9th Cir. 1967) 386 F.2d 132, 139, this

**40.** While *Caceres* and *Sourapas* involved failure of agencies to comply with their own regulations, the suppression doctrine should be equally applicable when one government agency intentionally circumvents the regulations of another. *See also United States v. Basurto* (9th Cir. 1974), 497 F.2d 781, 793–94 (Hufstedler, J., concurring specially) (circuit court has supervisory power to assure that integrity is maintained in administration of justice). In addition to the Bureau of Customs misconduct, the I.R.S. breached 39 C.F.R. § 233.2(g)(4) by failing to disclose the existence of the cover to Choate during discovery proceedings (*see* note 14 *supra*).

**41.** The mail cover produced no return addresses from outside the United States. If the procedure were drawn to Fourth Amendment standards, none of the information obtained would have been turned over to Williams even if his averments had been truthful.

**42.** Those statutes variously prohibited obstructing or retarding the passage of mail (18 U.S.C. § 1701), taking letters with a design to obstruct correspondence or to pry into the business or secrets of another (*id.* § 1702); and

unlawfully detaining or delaying letters (*id.* § 1703). The *Cohen* court denied the statutory claim relying on earlier cases and the fact that the administrative practice of longstanding could not be deemed in violation of postal statutes and summarily rejected the First Amendment claim. (378 F.2d at 760 & n.18.)

**43.** The asserted non-compliance with postal regulations in *Schwartz* involved a question of who was entitled to receive the information; a matter not here in issue.

**44.** The *Costello* Court stated in *dicta* its belief that *Ex parte Jackson* (1878) 96 U.S. 727, 24 L.Ed. 877 "implies that without offense to the Constitution or statute writing appearing on the outside of envelopes may be read and used." (255 F.2d at 881.) However, it does not appear that the defendant alleged violation of his constitutional rights, nor that the asserted implication exists in *Ex parte Jackson.* (*See also* discussion of this dictum in *United States v. Leonard, supra,* 524 F.2d at 1087 and in *United States v. Bianco* (2d Cir. 1976) 534 F.2d 501, 507–08. *And see* note 74 *infra*.

court stated merely that "the Fourth Amendment does not preclude postal inspectors from copying information contained on the outside of sealed envelopes in the mail, where no substantial delay in the delivery of the mail is involved. *See Canaday v. United States*, 8 Cir., 354 F.2d 849, 856." *Canaday* had earlier been the first case to reach asserted "constitutional rights," but it stated simply that *Schwartz* and *Costello, supra*, "unquestionably validate the mail watch conducted in this case."[45] I would believe myself bound by *Lustiger*,[46] despite its dealing with an important issue of constitutional law as if it were a throw-away line, but for the fact that Fourth Amendment jurisprudence has been transformed since *Lustiger* was decided by the Supreme Court's decision in *Katz v. United States* (1967) 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, and its spawn. (*See, e.g., Zweibon v. Mitchell* (1975) 170 U.S.App.D.C. 1, 516 F.2d 594 (*en banc*) (practices valid pre-*Katz* must be re-examined in light of its holding).)

In *Katz* and in *Warden v. Hayden* (1967) 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, decided in the same term, the Court moved away from the property concepts which had previously restricted application of the Fourth Amendment (*see also Berger v. New York* (1967) 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040.) Before *Katz*, the Fourth Amendment was thought to apply only to governmental intrusions which constituted a trespass on the property rights of the defendant.[47] (*See generally*, Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 356–58 (1974); Kitch,

*Katz v. United States*: The Limits of the Fourth Amendment, 1968 Sup.Ct.Rev. 133; Note, Formalism, Legal Realism, and Constitutionally Protected Privacy under the Fourth and Fifth Amendments, 90 Harv.L. Rev. 945, 961–68 (1977).) Similarly, before *Warden v. Hayden*, the Government could seize only evidence the nature of which vitiated the defendant's property rights— *e.g.*, contraband, stolen property. The critical recognition of the October Term 1966 was that the legitimacy of all governmental intrusions must be determined by reference to the " 'fundamental criteria' laid down by the Fourth Amendment" which concerns itself with the privacy of the individual which is "the very essence of constitutional liberty and security" (*Berger v. New York, supra*, 388 U.S. at 49, 50–53, 87 S.Ct. at 1878), not property rights.

Thus in deciding *Lustiger* prior to the decision in *Katz*, this court might well have concluded that while the contents of mail could not be investigated absent Fourth Amendment protections (*Ex parte Jackson* (1878) 96 U.S. 727, 24 L.Ed. 877), a mail cover did not intrude upon a protected area because it did not penetrate the sealed portion of a piece of correspondence. *Katz* and its progeny have indicated, however, that "the reach of [the Fourth] Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure." (389 U.S. at 353, 88 S.Ct. at 512.)

This view has been reiterated in subsequent cases which have viewed the Fourth Amendment as implicated even where sei-

---

**45.** (8th Cir. 1966) 354 F.2d 849, 856. The specific constitutional provisions in issue were not mentioned, but it would appear the right to privacy and Fourth Amendment were involved. (*See id.* at 856–57.) The *Canaday* court spent considerably more time considering defendant's claims that the mail cover regulation was violated and that mail tampering statutes were violated. (*See id.* at 856.)

**46.** I also consider *Lustiger*, dealing with a post office mail watch of a person suspected of mail fraud, as distinguishable from the instant issue of use of a mail cover to discover evidence of a crime completely unrelated to use of the mails. (*See Hodge v. Mountain States*

*Tel. & Tel. Co.* (9th Cir. 1977) 555 F.2d 254, 265–67 (Hufstedler, J., specially concurring).)

**47.** *E.g., United States v. White* (1971) 401 U.S. 745, 748–50, 91 S.Ct. 1122, 28 L.Ed.2d 453 (*Katz* overruled *On Lee v. United States* (1952) 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270, to the effect one must show trespass to establish violation of the Fourth Amendment). *See also United States v. Magana* (9th Cir. 1975) 512 F.2d 1169 (reasonable expectation of privacy not property rights govern permissible scope of search); Note, Types of Property Seizable Under the Fourth Amendment, 23 U.C.L.A. L.Rev. 963 (1976).

zures occur in the public streets—*e. g., Terry v. Ohio, supra,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and *Sibron v. New York* (1968), 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (seizure of person on street must conform to "reasonableness" requirements of Fourth Amendment); *United States v. Moore* (1st Cir. 1977) 562 F.2d 106 (use of beeper to trace car implicates Fourth Amendment which requires probable cause crime is being committed). The Supreme Court has recently reaffirmed this view in *United States v. Chadwick* (1977) 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538, rejecting the Government's contention that "the Fourth Amendment protects only interests traditionally identified with the home." (*Id.* at 6–7, 97 S.Ct. at 2480.) The Court stated there that the Amendment protects interests beyond homes, offices, and private communications, relying *inter alia* on *Ex parte Jackson* as standing for "the settled constitutional principle . . . that a fundamental purpose of the Fourth Amendment is to safeguard individuals from unreasonable government invasions of legitimate privacy interests, and not simply those found inside the four walls of the home." (*Id.* at 9–11, 97 S.Ct. at 2483 (citation omitted).) It is therefore necessary to examine the mail cover procedure in some detail to see whether it trenches upon privacy interests which are at the heart of the Fourth Amendment.

Since *Katz,* the only court of appeals to consider the applicability of the Fourth Amendment to mail covers has been the Second Circuit in *United States v. Leonard, supra,* 524 F.2d 1076.[48] (*See also United States v. Bianco* (2d Cir. 1976) 534 F.2d 501, 507–08.[49]) The *Leonard* case involved use of a mail cover to monitor all incoming air mail from Switzerland without return addresses. Photocopies of the covers of such mail were used to compare their postmarks with those used by Swiss banks, and where they matched, a random sample of recipients of the letters was investigated for possible income tax evasion by use of secret Swiss bank accounts. (524 F.2d at 1085.[50]) In Leonard's case, an IRS investigation was already under way, but the fact that his name came up in the mail cover led to an eventual attempt at his trial to show that he had lied in executing an affidavit stating that he had no foreign bank account and that his tax evasion was thus willful fraud. (*Id.* at 1086.)[51] The Second Circuit rejected Leonard's assertion that the mail cover was an unreasonable search in violation of the

**48.** In *United States v. Isaacs* (N.D.Ill.1972) 347 F.Supp. 743, *aff'd on other grounds* (7th Cir. 1974) 493 F.2d 1124, a district judge summarily rejected the assertion by former United States Court of Appeals Judge Otto Kerner that a mail cover surveying all mail received in his chambers violated the Fourth Amendment. Without more, the district judge relied upon the precedent previously discussed at notes 42–46, *supra,* and stated that nothing in *Katz* required reconsideration, citing *Hoffa v. United States* (1966) 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374. (347 F.Supp. at 750.) *Hoffa* was decided prior to *Katz* and deals with the very different issue of use of a confidential informant. In any event, decisions of district courts in other circuits are not binding here. The only Seventh Circuit case involving a mail cover was *United States v. Balistrieri* (7th Cir. 1968) 403 F.2d 472. There the court held, *inter alia,* that the evidence proffered at the trial was free from the taint of illegal searches because of subsequent independent leads developed as a result of a mail cover and other investigations. (*Id.* at 475–77.) It does not appear anywhere in the opinion that the defendant argued that the mail cover was itself violative of the Fourth Amendment and the court certainly did not discuss the issue.

**49.** In *Bianco,* the Second Circuit found that the defendant had waived any objection to the mail cover which had been maintained for approximately 10 years (534 F.2d at 507), and that their decision in *Leonard, supra,* had not so significantly changed the law of the circuit as to bring the defendant within the rule that waiver will be ignored if objection at the trial would have been futile.

**50.** Huge numbers of envelopes were involved and only a random sample was investigated. (524 F.2d at 1085.)

**51.** The photocopies obtained from the mail cover were not introduced in evidence, and it would appear that no proofs were directly obtained from it which were used at trial. Thus, the prosecution might not have been tainted, even if the cover had been found illegal.

Fourth Amendment by stating, *inter alia*, that there is no reasonable expectation of privacy with respect to information on the covers of international mail. (*Id.* at 1087.) [52]

Without expressing any view on the wisdom of the *Leonard* decision, its conclusion cannot be controlling with respect to our consideration of the Fourth Amendment's applicability to mail covers of domestic mail.[53] The search in *Leonard* falls within the rationale of the "border search" exception to the warrant clause of the Fourth Amendment. Very different considerations apply to domestic mail. (*Compare United States v. Ramsey* (1977) 431 U.S. 606, 616–625, 97 S.Ct. 1972, 52 L.Ed.2d 617 where Justice Rhenquist emphasized "the distinction between searches within this country, requiring probable cause, and border searches" of international mail which were not protected by the Fourth Amendment (*id.* at 618, 97 S.Ct. at 1979) *with United States v. Van Leeuwen* (1970) 397 U.S. 249, 251–53, 90 S.Ct. 1029, 25 L.Ed.2d 282, noting warrant is required where search of domestic mail intrudes into area protected by Fourth Amendment.)

### B. Mail Covers in the Light of Katz and its Progeny

In *Katz v. United States*, the Court stated that "what [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected" from warrantless searches by the Government. (389 U.S. at 351–52, 88 S.Ct. at 511.) In subsequent decisions, the Court has variously defined the protections of the Fourth Amendment as applying "wherever an individual may harbor a reasonable 'expectation of privacy' " (*Terry v. Ohio, supra*, 392 U.S. at 9, 88 S.Ct. at 1873) and as the " 'right of the individual to be free in his private affairs from governmental surveillance and intrusion.' " (*Whalen v. Roe, supra*, 429 U.S. at 599, n.24, 97 S.Ct. at 876.)[54]

The recurring use of the word "privacy" in defining the personal sphere protected by the Fourth Amendment tends perhaps to obscure the issues critical to a determination of whether a particular government practice trenches upon and violates Fourth Amendment interests. The privacy protected by the Fourth Amendment is related to the liberty interests which preclude governmental interference with highly personal decisions [55] and to the right to keep per-

---

**52.** In *Leonard*, the court also found significance in the fact that the information obtained from that mail cover respecting the existence of foreign bank accounts was subsequently made available to law enforcement agencies via the "Bank Secrecy Act" whose constitutionality was upheld in *California Bankers Association v. Schultz* (1974), 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812. (*See* 524 F.2d at 1087.) As the question in *California Bankers Ass'n* was primarily whether such information was absolutely privileged from government scrutiny, rather than whether the Fourth Amendment permitted it to be obtained without a warrant, the *Leonard* opinion focused upon the absolute restraints on government searches of the reasonableness clause of the Fourth Amendment, and not upon the warrant clause, which I view as determinative here. That this was the primary concern of Judge Friendly is also suggested by his dictum to the effect that surveillance of every piece of mail received by every citizen might violate the right of *privacy*. (*Id.*)

**53.** All of the mail received by Choate during the period of the cover came from domestic sources, and it is the cover of mail from Choate's local bank which led to most of the contested evidence. Had the cover been limit-

ed to the type of mail allegedly being investigated (communications with a South American return address), it would have applied only to international mail and might have fallen within the *Leonard/Ramsey* rationale. An additional distinction is that *Leonard* involved a massive surveillance of all mail emanating from a single source, which involved extremely different Fourth Amendment questions from the particularized surveillance of all mail sent to a single criminal suspect here in issue.

**54.** Quoting Kurland, The private I, The University of Chicago Magazine 7, 8 (Autumn, 1976) and distinguishing Fourth Amendment "privacy" concerns from those respecting non-disclosure of private facts and freedom from governmental compulsion in thoughts and decisions.

**55.** *E. g., Carey v. Population Services International* (1977) 431 U.S. 678, 97 S.Ct. 2010 (sales and advertising of contraceptives). *See Whalen v. Roe, supra*, 429 U.S. at 598–599 n.23, 97 S.Ct. 869 n.23 and cases cited therein. *See generally* Henkin, Privacy and Autonomy, 74 Colum.L.Rev. 1410 (1974); Clark, The Ninth Amendment and Constitutional Privacy, 5 Toledo L.Rev. 83 (1973); Lusky, Invasion of

sonal facts to oneself.[56] But it is both more and less than those rights. It is more because the Fourth Amendment may protect citizens even in areas in which none of the other "privacy" interests exist, and it is less because increasingly the Fourth Amendment has been viewed as a procedural shield, but not as an absolute bar to governmental intervention. As the Court so wisely stated in *Katz*, the protections of the Fourth Amendment very "often have nothing to do with privacy at all." (389 U.S. at 350, 88 S.Ct. at 510.)

Thus, the Fourth Amendment protects against unreasonable governmental intrusions when one's person or property is in an area in which one has neither a property interest, nor any personal stake or claim—e. g., a public telephone booth, a public street,

and, since 1878, the United States Post Office.[57] It is therefore irrelevant for Fourth Amendment purposes that the intrusion occurs in an area in which one might (both objectively and subjectively) reasonably expect governmental surveillance or snooping to occur.[58] It is also unpersuasive that some or many citizens may know that such practices actually exist.[59] Therefore, the fact that persons may realize that unauthorized snooping in their mail may occur, or even that mail covers are used as law enforcement surveillance techniques, makes the Fourth Amendment expectation of privacy here asserted no less reasonable.[60]

Unlike many privacy interests which present absolute barriers to governmental "intrusion" by regulation or forced disclosure of private facts, the Fourth Amend-

Privacy: A Clarification of Concepts, 72 Colum.L.Rev. 693 (1972).

**56.** *See generally,* A. R. Miller, The Assault on Privacy (1971); Symposium, Surveillance, Dataveillance and Personal Freedoms: Use and Abuse of Informational Technology (Colum. Human Rights L.Rev. eds. 1973); K. Greenawalt, Legal Protections of Privacy (1975) (Report to the President's Office of Telecommunications Policy); Miller, Personal Privacy in the Computer Age: The Challenge of a New Technology in an Information-Oriented Society, 67 Mich.L.Rev. 1091 (1969).

**57.** *Katz v. United States, supra; Terry v. Ohio, supra; Ex parte Jackson, supra; United States v. Moore, supra* (placing "beeper" on car traversing public roads implicates Fourth Amendment; probable cause required). *See also, e. g., United States v. Brignoni-Ponce* (1975) 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607, and *United States v. Ortiz, supra,* 422 U.S. at 891, 95 S.Ct. 2585 (automobile seizures cannot be indiscriminate); *United States v. Phillips* (5th Cir. 1973) 478 F.2d 743; *United States v. Sohnen* (E.D.N.Y.1969) 298 F.Supp. 51 (4th amendment applies to opening of domestic mail); and *see Williams v. Blount* (D.D.C.1970) 314 F.Supp. 1356 (3-judge court) (Post Office may not resort to summary process to detain or impound domestic mail). The Fourth Amendment is implicated in other searches of personal possessions in governmental custody—e. g., *United States v. Chadwick, supra* (trunk in police custody).·

**58.** Thus, the Court has in the past placed a Fourth Amendment shield between the government and privacy areas previously invaded with impunity—e. g., *Camara v. Municipal*

*Court* (1967) 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (housing inspections); *Terry v. Ohio, supra* ("stop and frisks"). *See also* Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 384 (1974); Note, Types of Property Seizable Under the Fourth Amendment, 23 U.S.L.A.L.Rev. 963, 970–71 (1976).

**59.** *See Nixon v. Admin. of General Services* (1977) 433 U.S. 425; 458 n.20, 97 S.Ct. 2777, 53 L.Ed.2d 867 (whether privacy interests do or do not exist does not turn upon prior governmental respect for them). *United States v. Ortiz, supra,* 422 U.S. at 895, 95 S.Ct. 2585 (great regularity does not mitigate the invasion of privacy); *Zweibon v. Mitchell, supra,* 170 U.S. App.D.C. at 23 & n.54, 516 F.2d at 616 & n.54 (no matter how inveterate the practice, it cannot be immunized from judicial scrutiny); *United States v. Davis* (9th Cir. 1973) 482 F.2d 893, 905 (reasonable expectation of privacy not vitiated by frequency of governmental intrusions).

**60.** The government can take little comfort in the fact that Congressional hearings may have generated a certain degree of publicity about the practice when it is, by current definition, conducted in absolute secrecy and will never be discovered unless legal proceedings ensue. "An actual, subjective expectation of privacy obviously has no place in a . . . theory of what the fourth amendment protects . . .. If it could, the government could diminish each person's [constitutional rights] merely by announcing half-hourly on television that . . . we were all forthwith being placed under comprehensive electronic surveillance." Amsterdam, *supra* note 58, at 384.

ment is seldom absolute. (*But see Fisher v. United States* (1975) 425 U.S. 391, 407 n.9, 96 S.Ct. 1569, 48 L.Ed.2d 39 (there may be a core of items whose seizure is totally prohibited by the Fourth Amendment).) Thus "when the State's reason to believe incriminating evidence will be found becomes sufficiently great, the invasion of privacy becomes, justified and a warrant to search and seize will issue." (*Id.* at 400, 96 S.Ct. at 1575.) Armed with a proper warrant or with sufficient cause in the "jealously guarded" situations in which a warrant is not required, the Government may invade almost any area in search of evidence of criminal activity.[61] It is apparent that mail cover procedures which comply with the Fourth Amendment may be employed to obtain the type of data seized from Choate's mail (*see United States v. Van Leeuwen, supra,* 397 U.S. at 252, 90 S.Ct. at 1032 ("even first-class mail is not beyond the reach of all inspection.").) I do not assert that the cover of an envelope is absolutely privileged from government scrutiny.

In my view, the Fourth Amendment protects citizens in their bodies, their possessions, and their information, whether they are at home, in public, or in governmental custody. It is operative in any context in which a citizen may reasonably expect that his affairs will be free from intrusive governmental scrutiny.[62] Practically speaking,

the Amendment applies whenever there is government activity which constitutes a search and regulates the manner in which it is conducted.[63]

The critical question then becomes what justification and procedural safeguards are required to accompany the search, for the Fourth Amendment imposes "the maximum restrictions upon the power of organized society over the individual.that are compatible with the maintenance of organized society itself." [64] As Mr. Justice Stewart said in *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564:

"In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won— by legal and constitutional means in England, and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing everyman's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important." (citation omitted.)

---

**61.** *E. g.,* the home, the contents of mail, papers consigned to one's accountant or attorney (*Fisher v. United States, supra* ), bank records (*United States v. Miller, supra* ), and even the interior of the body. (*Schmerber v. California* (1966) 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908.) *See also* Tribe, American Constitutional Law § 15–9, at 913–17 (1978). *See generally* Note, Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments, 90 Harv.L.Rev. 945, 968 (1977) (noting the historical shift from the view of the Fourth Amendment as an absolute bar to certain searches to a protector of the manner in which all searches are conducted).

**62.** *See United States v. Ortiz, supra,* 422 U.S. at 895, 95 S.Ct. at 2588 ("the central concern of the Fourth Amendment is to protect liberty and privacy from arbitrary and oppressive interference by government officials.").

**63.** *United States v. Chadwick* (1977) 433 U.S. 1, 9, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 ("Our

fundamental inquiry in considering Fourth Amendment issues is whether or not a search or seizure is reasonable under all the circumstances.") (Burger, C. J.).

**64.** *Watts v. Indiana* (1949) 338 U.S. 49, 61, 69 S.Ct. 1347, 1357, 93 L.Ed. 1801 (Jackson, J., concurring and dissenting). Thus, while even records on file with one's bank, attorney, and accountant may be obtained by the government, some judicial process is required—either subpoena or consent by the third party. Further while the police may "seize" the person of an individual without a warrant when he or she is in a public place (*United States v. Santana* (1976) 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300), probable cause is required, (*id.*) and indiscriminate seizures are prohibited (*Terry v. Ohio, supra,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889).

We must, therefore, examine in detail the instant mail cover to determine whether it constituted a search and seizure, whether it trenches upon personal interests protected by the Fourth Amendment, and if so, whether the procedure followed is acceptable under its standards.

### (1) The Mail Cover Was a Search of Choate's Mail and a Seizure of the Information on its Surface.

In order to execute the mail cover request, a postal employee was required to search through and segregate all mail being sent to find that posted to the subject addressee.[65] He then carefully scrutinized the covers of first- and fourth-class mail in order to record the requested categories of information.[66] This was patently a "search" of Choate's mail [67] and a "seizure" of the information on its cover. Like the utilization of a pen register which has been held to constitute a search of a telephone and a seizure of evidence thereby produced (*United States v. New York Telephone Company* (1977) 434 U.S. 159, 167, 98 S.Ct.

364, 370, 54 L.Ed.2d 376), a mail cover intrudes into a channel of communication and seizes evidence of who is being communicated with.[68]

The fact that the information is on the cover of the envelope may affect the reasonableness of the invasion but it renders the activity no less a search.[69] But for the mail cover, the information would have been noticed only momentarily and certainly unrecorded. Further, of critical import is the fact that the information was doubtless "seized" in that the Government made a permanent record of what was written on the surface of the mail.

The recording here is similar to the seizure of intangibles in the wiretap and bugging areas which have been held within the scope of the Fourth Amendment. (*See id.* (Rule 41, Fed.Rules Crim.Proc., also applies to seizures of intangibles.) *See also Alderman v. United States* (1967) 394 U.S. 165, 176–80, 89 S.Ct. 961, 22 L.Ed.2d 176 (nothing seen or found in the course of an unlawful intrusion is admissible evidence, including conversations); *Katz*

**65.** A certain amount of confusion has been introduced into the discussion by the suggestion that the impact of mail covers on the rights of senders of mail is here in issue. While it is apparent that certain mail covers may adversely affect the rights of senders—*e. g., Paton v. LaPrade, supra*, 524 F.2d 862, there is no suggestion that such is the situation here, nor that senders of mail will not be able to raise the issue in a proper case. Therefore, we need not deal with the "troublesome" question whether Choate can assert those rights. (*See Lamont v. Postmaster General* (1965) 381 U.S. 301, 307–08, 85 S.Ct. 1493, 14 L.Ed.2d 398 (Brennan, J., concurring) (whether addressees may assert constitutional rights of senders poses "troublesome" questions). *See also* Note on Asserting the Constitutional Rights of Other Persons, in Hart & Wechsler, The Federal Courts and the Federal System at 184 (2d ed. 1973); Note, Standing to Raise Constitutional Jus Tertii, 88 Harv.L.Rev. 423 (1974)), and we need not address those constitutional questions. *See Barrows v. Jackson* (1953) 346 U.S. 249, 254–60, 73 S.Ct. 1031, 97 L.Ed. 1586.

**66.** The recording in Choate's case was made by listing on a form the addressee, sender, return address, place and date of postmark, and class of mail. The cover applied to three locations: Choate's home, office, and post office box. Because no record was made, we must assume the contents of fourth class mail were not

searched, although this is permitted by postal regulation. *See* note 10, *supra*.

**67.** Even a standard dictionary, not usually the source of penetrating subtleties of definition, would recognize this as a "search." Thus, Webster defines search as follows: "to look into or over carefully or thoroughly in an effort to find or discover . . . to look into with thorough scrutiny and rigorous objective examination." Webster's Third New International Dictionary 2048 (1968).

**68.** Indeed, the seizure is more instructive than a pen register which merely records that a call was made to a specific number. A mail cover reveals that a piece of mail was actually sent, usually the identity as well as address of the correspondent, and other information, including the contents thereof in some classes of mail.

**69.** *See Katz v. United States, supra*, 389 U.S. at 352–53, 88 S.Ct. 507 (fact no physical penetration required "can have no constitutional significance"). *See also Terry v. Ohio, supra*, 392 U.S. at 18 n.15, 88 S.Ct. 1868 (rather than belabor the definition of search the sound course is to recognize that all government intrusions upon personal security are governed by the Fourth Amendment).

*v. United States, supra,* 389 U.S. at 352–53, 88 S.Ct. 507; *Berger v. New York, supra,* 388 U.S. at 51–53, 87 S.Ct. 1873 (capture of verbal evidence has been treated as a seizure since *Wong Sun v. United States, supra,* 371 U.S. at 485–86, 83 S.Ct. 407); *Warden v. Hayden, supra,* 387 U.S. at 304–05, 87 S.Ct. 1642.) That the information was captured by recording rather than by retaining the letters themselves makes the practice no less a seizure from the perspective of the Fourth Amendment. (*E. g., Davis v. Mississippi* (1969) 394 U.S. 721, 724, 89 S.Ct. 1394, 22 L.Ed.2d 676 (taking of anything of "evidentiary value" is within Fourth Amendment); *Silverthorne Lumber Co. v. United States* (1920) 251 U.S. 385, 391–92, 40 S.Ct. 182, 64 L.Ed. 319 (rejecting suggestion Fourth Amendment "covers the physical possession but not any advantages the government can gain" by copying papers illegally seized).) It is no less protected by the Fourth Amendment because the process used was the clumsy one of transferring the information by hand to a form rather than that of using high technology methods of making an exact likeness. (*See United States v. Leonard, supra* (in some mail covers photocopying is used).) Choice of technology cannot immunize a practice when the Government may obtain identical information by either route.

(2) *A Recipient of Mail has a Reasonable Expectation of Privacy in the Information on its Surface.*

The identity of one's correspondents, their location, and the frequency and dates of one's communications with them is ordinarily information private to the individual.

Mail covers aside, it is information which can only be obtained by questioning the recipient or searching his mail box or private papers. While an individual may realize that an isolated piece of mail may attract the attention of postal employees, he knows that ordinarily no one would have the ability or inclination to remember who writes to him.[70] As Professor Greenawalt stated in a report to the President's Office of Telecommunications Policy:

"Even more important than original recording of 'public' activities is what is done with the information recorded. . . If this information is systematically stored . . ., it is 'obtained' in a much more permanent sense and obtained in a way that may bother a person who has no objection to its being known in the trivial sense. Moreover, if pieces of similar information . . . are systematically stored and collated, 'new' information may be obtained . . . that would be unavailable to any of the people who have learned only one or a few of the pieces of information."

(Greenawalt, Legal Protections of Privacy 39 (Report to the President's Office of Telecommunications Policy 1975).) Thus, while I might concede that a sender or recipient of mail impliedly consents to the visual inspection of the exterior of any individual piece of mail for a purpose connected with postal service activities,[71] he cannot be said to acquiesce thereby in the storage of the information, which creates a "data bank" usable against him which would not otherwise exist.[72]

As was previously noted, the compilation of data obtained through a mail cover ex-

---

**70.** It is thus unlike bank records and telephone company records which one knows are regularly recorded. (*E. g., Miller v. United States, supra; Hodge v. Mountain States Tel. & Tel., supra,* 555 F.2d at 266. The mail cover is itself the sole source of this data, and it is obtained and recorded by the government—not a private party. Unlike even the persons who buy dangerous drugs in *Whalen v. Roe, supra,* 429 U.S. at 602, 603, 97 S.Ct. 869, the addressee of mail cannot by choice opt out of the data collection system.

**71.** When a letter or parcel itself gives rise to suspicion it can be retained by the post office while a warrant to search it is obtained. (*United States v. Van Leeuwen, supra*); or it maybe searched without a warrant if it falls within the border search warrant exception); *United States v. Ramsey, supra.*

**72.** Senders of mail may reveal the details of their own correspondence with a particular individual (*see Ex parte Jackson, supra,* 96 U.S. at 735), but none know the identities of all other.

poses the personal life of the subject to law enforcement agencies in a manner unobtainable even through surveillance of his movements.[73] Because the data will "reveal much about his relationships with both individuals and organizations" his First Amendment "freedom of association is also implicated." (*Nixon v. Administration of General Services, supra*, 433 U.S. at 532, 97 S.Ct. 2835 (Burger, C. J., dissenting), *citing NAACP v. Alabama* (1958) 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488.) The data is certainly information which one would ordinarily expect to keep to oneself.

If it is not data in which one has a reasonable expectation of privacy for Fourth Amendment purposes, this must be because of the location in which it surveyed: on the cover of a piece of mail matter consigned to the United States Postal Service for delivery.

We begin with the teaching of *Ex parte Jackson* that:

"Letters . . . in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be. Whilst in the mail, they can only be opened and examined under like warrant, issued upon similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subjected to search in one's own household. No law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters and such sealed packages in the mail; and all regulations adopted as to mail matter of this kind must be in subordination to the great principle embodied in the Fourth Amendment of the Constitution." (96 U.S. at 733.[74])

A series of justifications for warrantless mail covers have been asserted by analogy to cases involving Fourth Amendment exceptions to the warrant requirement.

The first is that the information seized is in "plain view" because the outside of the envelope is in an area subject to postal inspection for mail purposes; therefore, it can be searched and seized at will. This analogy fundamentally misconceives the

---

**73.** In addition to the data here in issue, mail covers may include identifying the content of anything open to inspection by law. Thus, postal inspectors could photocopy messages on postcards and the contents of any 2nd-4th class mail, permitting law enforcement agencies to read personal communications, etc. *See Fisher v. United States, supra*, 425 U.S. at 427, 96 S.Ct. at 1588 (Brennan, J., concurring) ("Personal letters constitute an integral aspect of a person's private enclave.")

**74.** The government makes much of the distinction in *Ex parte Jackson* "between different kinds of mail matter,—between what is intended to be kept free from inspection, such as letters, and sealed packages subject to letter postage; and what is open to inspection, such as newspapers, magazines, pamphlets, and other printed matter, purposely left in a condition to be examined." *Id.* The distinction was also mentioned by the Second Circuit in *United States v. Leonard, supra*, 524 F.2d at 1087. The implication is that, as return addresses are not intended to be kept free from inspection, they can be collected by the Postal Service at its will. *Jackson* involved the constitutionality of a statute which banned use of the mails to transport lottery tickets. (96 U.S. at 728.) The Court held that it was permissible to exclude such items from the mails but stated, in dictum, that enforcement of the ban could not be carried out in a manner which infringed upon other constitutional rights. (*Id.* at 732.) Thus, a search of sealed letters and packages for such items would violate the Fourth Amendment; while evidence could be derived from other sources—by testimony of the recipient—or if found in mail open to examination. (*Id.* at 735–36.) As there was no indication that the conviction in issue had been attained by an opening of sealed mail, the writ of habeas corpus was denied. (*Id.* at 737.)

The distinction made in *Jackson* was only that if mail matter was not sealed against inspection and contained prohibited contents, the Fourth Amendment would not restrain the Postal Service from prosecution under the statute. It could not have been intended to deal with the very different question of the uses which the Post Office could make of essentially private information located in a place which postal employees may inspect.

plain view doctrine as described in *Coolidge v. New Hampshire, supra,* 403 U.S. 464–73, 91 S.Ct. 2022. In *Coolidge,* Mr. Justice Stewart noted that "in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of the seizure. The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal." (*Id.* at 465, 91 S.Ct. at 2037.) (emphasis in original.)

He stated that "plain view" will justify seizure of evidence when two prerequisites are satisfied: first, there must be a prior Fourth Amendment justification for the initial police intrusion or stop as "plain view *alone* is never enough to justify the warrantless seizure of evidence" (*id.* at 468, 91 S.Ct. at 2039), (emphasis in original) and second, the evidence in question must be discovered inadvertently. (*Id.* at 469–71, 91 S.Ct. 2022. *Accord United States v. Basurto* (9th Cir. 1974) 497 F.2d 781, 787–88; *United States v. Sedillo* (9th Cir. 1974) 496 F.2d 151, 152–53 (Hufstedler, J., dissenting).) The prior justification for the intrusion need not be a warrant if it meets Fourth Amendment criteria. (403 U.S. at 465, 91 S.Ct. 2022 (e. g., "hot pursuit"). *See also United States v. Gunn* (5th Cir. 1970) 428 F.2d 1057, 1060–61; *Coates v. United States* (1969) 134 U.S.App.D.C. 97, 99, 413 F.2d 371, 373 (car validly stopped; wallet visible on dashboard).) The evidence seized must be of a character by which "it is immediately apparent to the police that they have evidence before them." (403 U.S.

at 466, 91 S.Ct. at 2038.) Most important here is the *Coolidge* Court's holding that the doctrine cannot be used to justify a warrantless seizure of evidence the law enforcement agency knows in advance will be there and which it intends to seize. (*Id.* at 470–71, 91 S.Ct. 2022.)

Viewed in the light of *Coolidge,* it can readily be seen that mail covers cannot be justified by the plain view doctrine. The mail involved is itself unsuspicious and unremarkable. Thus, there is no cause, cognizable by the Fourth Amendment, which warrants its detention or detailed examination. (*Compare United States v. Van Leeuwen, supra. See also Collins v. Wolff* (D.Neb.1972) 337 F.Supp. 114, 117, *aff'd* (8th Cir. 1972) 467 F.2d 359 (holding post office could not use plain view doctrine to justify seizure and examination of parcel whose contents were revealed due to postal negligence in breaking open its wrapping).[75]) The sole cause for the search and seizure is the prior advice of a law enforcement agency that this particular category of mail may contain useful evidence. It thus falls within the set of cases as to which obtaining a warrant will present no substantial problem and for which plain view offers no justification.[76] (*Coolidge, supra,* 403 U.S. at 470–71, 91 S.Ct. 2022.[77])

A second proffered justification is on a theory of consent by analogy to the cases which hold that one has no reasonable expectation of privacy in that which one knowingly reveals to a third party (e. g., *United States v. Miller, supra,* 425 U.S. 435,

---

**75.** Information on the surface of mail matter is not located in an area "accessible to the public" (*Katz v. United States, supra*), or to law enforcement agencies in general. It is in an area accessible only to postal employees because the mail has been consigned to them for delivery on a fee paying basis. The mails are thus an area in which privacy interests are greater than a public street or even a telephone booth, as none but postal employees can ordinarily see them.

**76.** *United States v. Santana, supra,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300, is not on point. In *Santana,* the Court held simply that when a police officer has probable cause to effect a

warrantless arrest in a public place, the suspect may not defeat the arrest "by the expedient of escaping to a private place." (*Id.* at 43, 96 S.Ct. at 2410.) Critical was the prior Fourth Amendment justification for the seizure of the person. Nothing in *Santana* suggests that anything in public view may be seized at will by police officers.

**77.** Moreover, when postal employees executed the *Choate* mail cover, they acted in effect as agents of the Bureau of Customs, and there can be no claim that information on the surface of *Choate's* mail would ordinarily be in their "plain view."

96 S.Ct. 1619, 48 L.Ed.2d 71; and the informer cases—*Osborn v. United States* (1966) 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394; *Hoffa v. United States* (1966) 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374; *Lewis v. United States* (1966) 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312). As a first matter, it is difficult to see how even a constructive consent to search mail can be deemed to exist on behalf of a recipient of mail. Arguably, a sender of mail, by his choice of class and the material placed on the cover and his decision to send something by mail in the first place, consents to the ordinary incidents of inspection en route. However, a recipient has no choice in most of what is sent to him. Mail sent to him is delivered by the United States Postal Service, and, as it is for most practical purposes a constitutionally created monopoly, there can be little or no choice to receive mail in an alternative fashion.[78]

*Miller* and the informer cases rely on the theory that when one knowingly reveals information to a third party, he assumes the risk that it will be conveyed to the Government. (*United States v. White* (1971) 401 U.S. 745, 752, 91 S.Ct. 1122, 28 L.Ed.2d 453.) The essence of the theory is that by allowing information or records respecting yourself to come into the possession of another private party, you waive privacy rights and must realize they may reveal your secrets. Mail covers differ for a number of reasons. As noted above, the recipient of mail does not knowingly reveal anything—mail on its way to him is surreptitiously examined before it ever enters his possession. Moreover, the information in the form collected is not known by him to exist anywhere nor does he consent to its compilation. Thus, in *Miller* and the informant cases, the suspects could have decided not to have a bank account or to refrain from revealing their criminal enterprises to a secret informant. (*See* n. 70, *supra*.) They also knew the information existed. Here, there is no reason for a mail cover suspect to assume that a list of all his correspondents has been

compiled. Finally, and most importantly, the United States Postal Service is not akin to a bank or a secret informer—it is the Government itself. Scrutiny of federal agent behavior is subjected to a very different standard from that of private parties. (*See Silverthorne Lumber Co. v. United States, supra*, 251 U.S. at 391, 40 S.Ct. at 182, ("the case is not that of knowledge acquired through the wrongful act of a stranger, but it must be assumed that the Government planned or at all events ratified the whole performance."). *See also Bivens v. Six Unknown Named Agents of the Federal Bureau of Investigation* (1971) 403 U.S. 388, 391–92, 91 S.Ct. 1999, 29 L.Ed.2d 619.)

The final justification is that of consent revelation to the Government. (*E. g., Whalen v. Roe, supra*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64.) *Whalen* held that in conjunction with its police power to regulate the distribution of dangerous drugs, the State of New York could maintain a data bank of all prescription sales of such drugs against a claim that such a recording was an impermissible invasion of the right of privacy. The *Whalen* Court noted that the case did not involve the "affirmative, unannounced, narrowly focused intrusions into individual privacy" protected by the Fourth Amendment. (*Id.* at 604, n. 32, 97 S.Ct. at 879.) It held only that a state was not *absolutely* barred from collecting information which was reasonably related to the important public purpose of regulating dangerous drugs and was protected against disclosure. (*Id.* at 605–606, 97 S.Ct. 869. *See Nixon v. Administration of General Services, supra*, 433 U.S. at 533, 97 S.Ct. at 2835 (Burger, C. J., dissenting) ("No personal, private business, or political confidences were involved.").) Thus, if persons choose to purchase such drugs and doctors to prescribe them, they could be required to complete the forms used for data banking. The rationale in *Whalen* provides no justification for the mail cover procedure. It sug-

---

78. *E. g., National Assoc. of Letter Carriers v. Ind. Postal System of America, Inc.* (10th Cir. 1972) 470 F.2d 265, 270.

gests only that the state can require the making of a record as a condition of purchasing a dangerous and controlled substance without violating the right of the purchaser to privacy in choice of drugs and his doctor-patient relationship. The Court also emphasized the tight controls on security and use of the data. (429 U.S. at 593–595, 600–603.)

It is apparent that mail covers fall squarely within Supreme Court Fourth Amendment precedents which hold that the Amendment is implicated when the Government searches and seizes private objects and information, even though they are temporarily in public custody, or even in a public place. (*United States v. Chadwick, supra; Terry v. Ohio, supra.*)

### (3) *Validity of Mail Cover Procedures in Light of the Fourth Amendment.*

Given the conclusion that the interests invaded by a mail cover are protected by the Fourth Amendment, it is necessary to examine the Choate search in light of its procedural requirements. (*See Sibron v. New York, supra,* 392 U.S. at 59–62, 88 S.Ct. 1889 (holding it is unnecessary to first examine the facial validity of statutory authority for a warrantless search in light of the Fourth Amendment; concern is rather with facts of the actual search).) As earlier noted, a letter was sent by the Bureau of Customs to the Postal Inspector in Charge in Choate's area. It requested a cover of first- and fourth-class mail sent to him at three addresses (home, office, and post office box) for thirty days on grounds it would likely reveal the return address of a South American "connection." On that showing, the Inspector in Charge authorized, assembled, and sent to the Bureau of Customs a cover of all mail received by Choate at those addresses during the period—none of which had as a return address a location outside the United States. Two aspects of the Fourth Amendment are implicated—the warrant clause and the reasonableness clause.

### (a) *The Warrant Clause*

We begin with the premise that "there is no more basic constitutional rule in the Fourth Amendment area than that which makes a warrantless search unreasonable except in a few 'jealously and carefully drawn' exceptional circumstances" (*United States v. Watson* (1976) 423 U.S. 411, 427, 96 S.Ct. 820, 46 L.Ed.2d 598 (Powell, J., concurring)), and that " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment.' " (*Coolidge v. New Hampshire, supra,* 403 U.S. at 454–55, 91 S.Ct. at 2032. *See also Katz v. United States, supra,* 389 U.S. at 356–59, 88 S.Ct. 507; *Aguilar v. Texas* (1964) 378 U.S. 108, 110–11, 84 S.Ct. 1509, 12 L.Ed.2d 723.)

The Supreme Court recently reiterated this rule in *United States v. Chadwick, supra,* 433 U.S. at 6–11, 97 S.Ct. 2476 in which it held that the *per se* rule requiring a warrant applied to searches outside the home—there to the search of a trunk seized in the course of an arrest and in police custody. In so doing, it relied upon *Ex parte Jackson, supra,* and *United States v. Van Leeuwen, supra,* as standing for the proposition that searches of mail while in postal custody require a warrant. (433 U.S. at 9–11, 97 S.Ct. 2476.)

As the Court noted in *Chadwick,* warrants are routinely required for searches conducted outside the home. (*See Id.* at 10–11, 97 S.Ct. 2476, and cases therein cited.) Moreover, there has never been any question raised but that where a law enforcement agency seeks to require a third party to conduct surveillance of a suspect or to divulge private records that a warrant—or its judicial equivalent, a subpoena—is required. (*E. g.,* in pen register surveillance, *United States v. New York Telephone Co.* (1977) 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (all sides assumed judicial order was necessary; issue was power to grant it);[79] in bank records, *United States*

---

**79.** *Hodge v. Mountain States Tel. & Tel., supra,* 555 F.2d 254 is not to the contrary. There the

Telephone Company had on its own motion installed a pen register to identify numbers

*v. Miller, supra; California Bankers Ass'n v. Schultz, supra;* and in lawyer's records, *Fisher v. United States, supra.*) In our type of mail cover, the Postal Service is in a similar position to a bank or the telephone company when requested to institute mail cover surveillance by a law enforcement agency. It has no reason to suspect, or otherwise regard as unique, mail received by the subject addressee. It is only because of the needs of the agency that it segregates his mail and collects the data. The need for judicial intervention is even greater than in the aforementioned situations because there is some hope that a third party will refuse to comply with an improper request. (*E. g., California Bankers Ass'n v. Schultz, supra.*)

Here the request is made to a coordinate law enforcement branch of an executive agency which is also engaged in the " 'often competitive enterprise of ferreting out crime' " (*Aguilar v. Texas, supra,* 378 U.S. at 111, 84 S.Ct. at 1512) and the agency has every reason to assist those it views as engaged in a similar pursuit. Even if we assume that the Postal Inspectors diligently inspect requests received for "reasonable grounds" and seek to discard those which amount to fishing expeditions, the constitutional determination is that a neutral magistrate, not an executive officer, should perform this task.

The crux of the problem for constitutional purposes was well stated in *United States v. United States District Court, supra,* 407 U.S. at 316–18, 92 S.Ct. at 2136, in which the Court held that warrants were required for national security wiretaps on domestic territory:

"These Fourth Amendment freedoms cannot properly be guaranteed if . . . surveillances may be conducted solely within the discretion of the Executive Branch. The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute. . . . But those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks. . . . The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised. This judicial role accords with our basic constitutional doctrine that individual freedoms will be best preserved through a separation of powers and division of functions among the different branches and levels of Government. . . . The independent check upon executive discretion is not satisfied . . . by . . . post-surveillance review. Indeed, post-surveillance review would never reach the surveillances which failed to result in prosecutions. Prior review by a neutral and detached magistrate is the time-tested means of effectuating Fourth Amendment rights." (*Id.* (citations omitted).)

There are "jealously guarded exceptions" to the warrant requirement (*United States v. Watson, supra,* 423 U.S. at 427, 96 S.Ct. 820) and we must examine them to decide whether the mail cover should be exempted. As the Government has not addressed the point with clarity, I take judicial notice of the two-fold contentions raised by the Post Office at congressional hearings in support

called by a person suspected of making obscene phone calls. After considerable investigation, it brought in the police. The question of state action being difficult on the facts, we simply concluded that where a telephone company installs such a device on its own to investigate abuse of its service the Fourth Amendment was not implicated and "[w]e leave for another day a Fourth Amendment challenge to the telephone company's installation of a pen register at the request of the Government to

investigate a crime that is unrelated to the delivery of telephone service." (*Id.* at 267 (Hufstedler, J., concurring).) In the *Hodge* circumstance, it would be absurd to reach any other result as the telephone company could not obtain a warrant to install a pen register of its own lines. A deceptively similar problem would arise if the instant case involved Postal Service investigation of mail fraud. There, however, it is the government which undertakes the search.

of this procedure: that the Fourth Amendment warrant requirements should not be applied to the mere "investigatory" activity of a mail cover and that it will be impossible in many instances to obtain a warrant because there is often no "probable cause" at the time a mail cover is instituted. (*See* n. 25, *supra*.) The majority opinion also proffers the suggestions that mail covers might come within the rationale of the "plain view" or "consent" exceptions to the warrant requirement because persons who send and receive letters know that their covers will be looked at by postal employees during the ordinary course of delivery and thus impliedly consent to its inspection. (*But see* discussion in section (2), *supra*.)

In the first place, I note that "to argue that the Fourth Amendment does not apply to the investigatory state is fundamentally to misconceive the purposes of the Fourth Amendment." (*Davis v. Mississippi, supra*, 394 U.S. at 726, 89 S.Ct. at 1397.) · The Fourth Amendment is routinely applied to such searches—e. g., detention of suspicious persons, wiretapping, and other investigative techniques.[80] The stage and circumstances of the investigation may affect the degree of cause necessary to permit a search, but it cannot do away with the warrant requirement. (*Camara v. Municipal Court, supra*, 387 U.S. at 533, 87 S.Ct. 1727.) More significant to that issue is the question "whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." (*Id.* at 533, 87 S.Ct. at 1733.)

In the circumstances herein, the Government cannot assert that there was any exigency or need for instantaneous results

which make obtaining a warrant unworkable. (*E. g., Coolidge v. New Hampshire, supra*, 403 U.S. at 470–71, 91 S.Ct. 2022.) Indeed, the mail cover procedure itself contemplates a Postal Service review which would not require less time than review by a magistrate.[81] Further, it does not appear that time was of the 'essence—a cover of any thirty-day period would have sufficed.

The only meaningful frustration which might occur is through the ordinary requisite of a showing of probable cause. In the present circumstance, we think the Government's fears that requiring such a showing would make mail covers impossible is illusory.[82] The requirement of showing probable cause does not require the requesting agency to prove beyond a certainty that the search will reveal the items sought.

"The magistrate is not required to determine whether *in fact* the items to be searched for are located at the premises to be searched, but only whether there is *reasonable ground* to believe they are there." (*United States v. Damitz, supra*, 495 F.2d at 55.) (emphasis in original).

It does not deny " 'law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate.' " (*Aguilar v. Texas, supra*, 378 U.S. at 111, 84 S.Ct. at 1512.) Where a law enforcement agency has reasonable grounds to believe that a person has committed or is attempting to commit a crime and that the mail cover will reveal evidence useful to its investigation, it will be able to establish probable cause for the

---

**80.** The Justice Department has also argued that imposition of a warrant requirement would "destroy its utility" by requiring a prior showing of probable cause. However, "conduct which violates the fourth amendment is not made legal merely because it helps ferret out crime." (*United States v. Moore, supra*, 562 F.2d at 111.) It is obvious that warrantless searches without probable cause would often be of great utility to law enforcement. They are, nonetheless, constitutionally prohibited.

**81.** In Choate's case, there was a six-day interval between the request and institution of the mail cover. This was ample time in which to obtain a warrant. .

**82.** Postal Inspector General Cotter admitted in the 1975 Hearings on Surveillance, *supra* note 10, that requiring court orders would not be the end of the world (*id.* at 313) and would retard the Postal Inspection Service's efficiency only in the areas of consumer protection and mail fraud—e. g., its own investigations of abuses of the mails, a subject not here in issue.

judicial authorization of a mail cover.[83] What will be required, unlike the procedure currently used, is that the underlying facts for the agency's belief be attested to and their veracity be subject to exploration at the time and thereafter. Further, an order will be drawn permitting capture only of that information logically related to the request so that no agent may obtain, as Agent Williams did, information wholly collateral to the asserted purpose of the mail cover. Finally, judicial records of returns on warrants are not subject to destruction every eight years and the addressee may be able to avail himself of the information regarding the mail cover in any subsequent proceeding. (*E. g.,* under the old, two-year cycle, Choate would have found that all records of the mail cover request had been destroyed prior to his indictment over two years later; undoubtedly other criminal defendants may find records have been destroyed when pre-indictment investigation exceeds eight years. (*See United States v. Bianco, supra,* 534 F.2d at 507 (mail cover extended over ten-year period).) We need not address the question of whether notice to the addressee is ever required. (*See Davis v. Mississippi, supra,* 394 U.S. at 728, 89 S.Ct. 1394 (where no attempt was made to comply with Fourth Amendment court will not speculate on the precise procedures which would satisfy it).)

(b) *The Reasonableness Clause*

Even if I could agree that a warrant was not required for mail covers, I would find the instant search unreasonable under the Fourth Amendment because the scope of the search unreasonably exceeded the purpose which justified it. The Supreme Court has recognized two sets of circumstances in which the Government may intrude into the private spheres of citizens: first, with a warrant, and secondly, in the area of warrant exceptions such as plain view, exigent circumstances and searches incident to arrest. In both, however, it has recognized the additional requirement that "the scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." (*Terry v. Ohio, supra,* 392 U.S. at 19, 88 S.Ct. at 1878 (warrantless "stop and frisk"). *Accord Chimel v. California* (1969) 395 U.S. 752, 762, 89 S.Ct. 2034, 23 L.Ed.2d 685 (search incident to arrest); *Sibron v. New York, supra,* 392 U.S. at 65–66, 88 S.Ct. 1889. *See also Stanford v. Texas* (1965) 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431.) Thus, even where a warrant may be dispensed with, the reasonableness clause is deemed to require exclusion of evidence seized by an overbroad search. (*Terry v. Ohio, supra,* 392 U.S. at 28–29, 88 S.Ct. 1868.)

Here, the sole justification for the mail cover was the need to identify a South American addressee. The information searched and seized, however, was not limited to foreign or South American correspondence. It was information respecting domestic correspondents such as banks and creditors having no conceivable relationship to the "goal which justified its inception" which was turned over to the Bureau of Customs and used in its further investigations. (*Sibron v. New York, supra,* 392 U.S. at 65, 88 S.Ct. 1889.) Where "the nature and scope of the search conducted . . . [are] so clearly unrelated to that justification [it] render[s] the [item seized] inadmissible." (*Id.; Terry v. Ohio, supra,* 392 U.S. 28–29, 88 S.Ct. 1868, 1878.)

For all of these reasons, I would order suppression of the evidence which was the fruit of the illegal mail cover, and I would accordingly affirm the district court.

---

**83.** When mail covers are used not to investigate specific suspects but to detect potential suspects as in *Leonard, supra,* use of different standards than probable cause may be justified. (*Camara v. Municipal Court, supra,* 387 U.S. at 534–39, 87 S.Ct. 1727.) This question is not presented by the facts herein, and I do not address it.